William MELSO t/a Melso Texaco Service and Timothy Musser t/a Musser Texaco, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

TEXACO, INC., Defendant.

Civ. A. No. 81–4209.

United States District Court, E. D. Pennsylvania.

Feb. 6, 1982.

Jerry S. Cohen, Michael D. Hausfeld, Kohn, Milstein & Cohen, Washington, D. C., Robert A. Swift, Kohn, Savett, Marion & Graf, P. C., Philadelphia, Pa., for plaintiffs.

Henry T. Reath, George E. Pierce, Jr., Duane, Morris & Heckscher, Philadelphia, Pa., Randall B. Robinson, White Plains, N. Y., for defendant.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

Plaintiffs, independent retailers of Texaco gasoline and products, (hereinafter "Texaco dealers") filed this action on October 15, 1981, seeking an injunction preventing defendant Texaco, Inc. (hereinafter "Texaco") from assessing Texaco dealers a three percent credit card invoice processing fee. On October 27, 1981, immediately prior to a scheduled hearing on plaintiffs' motion for a preliminary injunction, counsel in this case agreed, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, that trial of the action on the merits would be advanced and consolidated with the hearing on plaintiffs' motion for a preliminary in-

junction. The parties stipulated that this case satisfied the prerequisites to maintenance of a class action required by Federal Rules of Civil Procedure 23(a) and 23(b)(2). The Court certified a plaintiff class comprised of all Texaco service station dealers who have a supply agreement directly with Texaco and who are being supplied with gasoline by Texaco, and who will be charged three percent by Texaco on all credit card invoices submitted to Texaco for processing commencing November 1, 1981. The named plaintiffs were agreed to as class representatives. Trial on the merits was held before the Court on December 16, 17, 18, 21, 22, and 23, 1981.

The Texaco dealers allege that Texaco's action—charging a three percent fee to process the dealers' credit card invoices—constitutes: (1) an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) an illegal tie-in in violation of 15 U.S.C. § 1; (3) an unconscionable contract in violation of 13 Pa.C.S.A. § 2302 (the state statute adopting Section 2–302 of the Uniform Commercial Code); and (4) an ineffective modification of a contract that is void for failure of consideration and is a contract of adhesion. Plaintiffs have neither alleged nor argued a violation of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.* Plaintiffs' complaint averred that Texaco's action was barred by promissory estoppel, but this claim was voluntarily withdrawn by the plaintiffs at trial. For the reasons hereinafter set forth, the Court finds for the defendant on all counts in plaintiffs' complaint and will deny the injunctive relief requested by plaintiffs.

*Facts*

Texaco is a Delaware corporation engaged in the production, transportation, refining and marketing of crude oil and its products, more particularly in this case, gasoline. Its gasoline is distributed through approximately 24,000 Texaco branded service stations throughout the United States under the brand names of Fire Chief, Sky Chief, Lead Free and Texaco Gasahol. Texaco, whose sales comprise 5.9 percent of the total retail gasoline sales in the United States, transacts business in the Eastern District of Pennsylvania and is engaged in interstate commerce.

Plaintiff William Melso, trading as Melso Texaco Service, owns and operates a Texaco brand service station located at 6554 Frankford Avenue, Philadelphia, Pennsylvania, and has operated such service station since 1973. Plaintiff Timothy Musser, trading as Musser Texaco, owns and operates a Texaco brand service station located at 2242 Bridge Street, Philadelphia, Pennsylvania, and has operated such service station since 1972. The named plaintiffs advance claims common to the class and have fairly and adequately represented the interests of the class at trial.

In the past, Texaco charged its dealers an annual service fee for participating in Texaco's credit card program, which has existed in various forms since 1914. This fee, prior to November 1, 1981, did not exceed $36.00 per year. Immediately prior to November 1, 1981, Texaco had a credit card program in effect under which Texaco agreed to process any Texaco card invoices which were submitted by Texaco retailers to Texaco on authorized credit sales for processing at 100 percent of the face value of the invoices submitted. Before issuing credit cards, Texaco did not consult with dealers regarding the issuance of credit cards and did not consult with dealers on the terms contained in the credit cards. Generally, invitations to members of the public to apply for cards have been mailed out unsolicited, but issued only after a credit check. Texaco currently has issued in excess of 9 million credit cards of which more than 5 million are "active" accounts, that is, the holders of these cards make purchases of Texaco products with them at least once per year.

On August 31, 1981, all Texaco retailers and wholesalers were notified that the Retailer Travel Card Agreement (hereinafter "credit card agreement") between Texaco and its retailers and wholesalers was being amended to take effect as of November 1, 1981 by striking paragraph 8 which provided that:

Annual Travel Card Service Charge. The Retailer agrees to pay an annual charge for Texaco Travel Card Service. The charge shall equal one-half of one percent (.5%) of the total amount of Texaco Travel Card and affiliated credit card invoices submitted by Retailer to Texaco during a representative month, selected by Texaco in each calendar year, but in no event shall the annual Travel Card service charge exceed thirty-six dollars ($36.00).

and substituting in lieu thereof paragraph 9 which provides:

Credit Card Processing Charge. Retailer will submit credit card invoices to Texaco in a manner prescribed by Texaco. In submitting said invoices, Retailer will compute and deduct a processing charge equal to three percent (3%) of the gross total of the invoices. Texaco will, upon receipt of said invoices, credit Retailer ninety-seven percent (97%) of the gross total. Any such credit is subject to verification by the Texaco Credit Card Center. In the event that Retailer violates the preceding instructions, Texaco may require that Retailer forward said invoices to the Credit Card Center or other place designated by Texaco from time to time, whereupon Texaco will reimburse Retailer by check or credit memorandum. Reimbursement arrangements may be changed from time to time by Texaco.

In 1980, approximately 37 percent of total gasoline sales by Texaco retail dealers were made pursuant to Texaco credit cards. As noted above, the Texaco credit card program has existed in modified forms since 1914, interrupted only by a hiatus in the program necessitated by gasoline rationing during World War II. The now-familiar plastic Texaco credit cards with raised lettering first appeared in 1958, the year during which the "modern" Texaco credit card program began operating substantially as it does today.

For a brief period during the 1970's, Texaco processed American Express, Bankamericard (now Visa) and Mastercharge (now Mastercard) credit cards accepted by Texaco dealers for purchases at their stations.

In 1971, Texaco ceased accepting American Express. In 1979, Texaco discontinued processing Visa and Mastercard. At that juncture approximately 6 percent of Texaco's total retail gallonage was purchased with Visa or Mastercard cards. Since 1979, some Texaco dealers have arranged with various banks to process credit cards other than the Texaco card and continue to accept these other cards at their stations. Texaco dealers may continue to have separate agreements regarding other credit cards even though Texaco's post-November, 1981 credit program will again accept Visa and Mastercard for processing. Texaco dealers are not required to process credit cards through Texaco; they have the option of processing such other credit cards through any financial institution of their choice. The banks that process other credit cards generally charge a fee ranging from 2.5 percent to 5 percent of the face amount of the invoice. Many dealers continue to accept other credit cards such as Visa and Mastercard, but some Texaco dealers will accept them only for the purchase of parts, accessories, labor, or for gasoline purchases above a minimum amount. Many Texaco dealers found it uneconomical because of the percentage processing fee to accept other than Texaco credit cards for all gasoline purchases.

Prior to the revision of its credit card program, Texaco treated credit card invoices as legal tender. That is, Texaco credited the invoices submitted by one of its dealers at full face value against the dealer's account with Texaco. Texaco would pay the dealer cash for these invoices if requested, but dealers usually applied the invoice total to purchase gasoline or other products from Texaco. As of November 1, 1981, Texaco continued to accept these invoices and apply them to dealers' accounts, but at 97 cents on the dollar. Thus, today, a dealer submitting $1,000 of credit card invoices to Texaco receives credit toward the purchase of $970 of Texaco products. Texaco uses the $30 collected through its 3 percent processing fee to defray the costs of operating its credit card program such as billing the card users, collecting the amounts due, and financing the cost of money during the

interim between purchase and payment. Texaco also intends to use the processing fee to expand and improve its credit card program and to provide its dealers with new credit card imprinters. In a letter dated August 31, 1981, advising Texaco dealers of its intention to impose a 3 percent processing fee, Texaco stated in the letter that it believed that clause (7) of the credit card agreement permitted it to change the terms of its agreement as to what, if any, processing fee would be charged its dealers for submitting purchase invoices to Texaco. Clause (7), which has not been changed by Texaco, and remains a part of the standard credit card agreement form used by Texaco, states:

> (7) Modification and Termination. Texaco reserves the right to modify this Agreement by written notice to Retailer. Texaco reserves the right to cancel this Agreement at any time and to repossess its travel card imprinter, other travel card equipment, completed and blank invoices and other travel card forms. This Agreement shall terminate automatically upon the termination or cancellation of the Agreement of Sale under which Retailer buys petroleum products from Texaco.

The Texaco Retailer Credit Card Agreement is one of three standard form agreements normally entered into between Texaco and its dealers. The other two agreements are the Supply or Sales Agreement, and the Lease Agreement. As a matter of course, most all Texaco dealers enter into the sales agreement and the credit card agreement. Texaco dealers who lease their station premises from Texaco enter into the lease agreement.

The sales agreement provides that Texaco will sell its gasoline products, including gasoline, diesel fuel, motor lubricants, and antifreeze, to the dealer. The sales agreement grants the dealer the right to purchase these products in the quantities described and to sell those products under the Texaco brand name. The lease agreement sets forth the terms and conditions under which the dealer leases the service station from Texaco.

These three basic agreements (sales, lease, and credit card) are uniformly presented to the existing or potential Texaco dealer as a package. Texaco requires that the sales agreement and, where applicable, the lease agreement, be executed as a condition of dealing with the independent dealer. The Texaco dealers claim that the credit card agreement had to be executed as a part of the package. The evidence presented at trial, however, indicated that although Texaco normally seeks to have all three agreements executed, execution of the credit card agreement is not essential to becoming a Texaco dealer.

The market for petroleum products in the United States has experienced substantial upheaval during the past decade. The average price of a gallon of gasoline has tripled during that time as a result of many factors, including a depletion in the availability of the supply of oil, the pricing activities of the Organization of Petroleum Exporting Countries (OPEC), and inflationary pressures. Except for the periods of short supply, the gasoline market has remained highly competitive. In today's market, sellers of gasoline must price their products close to the level of their competitors or they will lose business. In many regions of the United States, a price difference of one-to-two cents per gallon induces a significant number of consumers to alter their gas purchasing habits. Thus, in today's market, the price to the consumer generally remains close between service stations. If one dealer reduces his price, others in the area must either match this reduction, or a significant number of consumers will turn to the dealer with the lowest price.

Within this highly competitive market for gasoline exist two submarkets—(1) dealers associated with major brands (hereinafter "branded dealers") and (2) dealers not associated with major brands (hereinafter "unbranded dealers"). A major brand gasoline retailer is one affiliated with one of the major brand oil companies (hereinafter "majors"). A major brand oil company, that is, one with a well-recognized brand

name, is a company that generally has a substantial refining capacity, a varied line of petroleum products, and a large network for marketing its product line at both the wholesale and retail level throughout a substantial portion of the nation. Major brands conduct their marketing in a more or less uniform fashion and operate credit card programs. Examples of major brand oil companies are Texaco, Mobil, Arco, Sunoco, Exxon, Gulf and Amoco. Non-major oil companies, by contrast, do not usually operate in all facets of the oil business. For example, some may have no refining capacity and obtain gasoline for retail outlets by purchasing the surplus gasoline of the major brand companies or from independent refiners that have no marketing network. Unbranded dealers also tend to operate in a smaller area than do the branded dealers. Unbranded dealers generally offer a limited product line and seldom offer automotive repair services while most branded dealers operate repair services. Unbranded dealers usually have no credit card program of their own, but may accept other credit cards such as Visa and Mastercard. As a result of their lower overhead, limited services and no-frills operation, unbranded dealers generally sell gasoline at a lower price than do the branded dealers. This price differential generally ranges from 2 to 4 cents per gallon.

The Texaco dealers contend that there are two distinct markets for gasoline—branded and unbranded. Texaco contends that all retail gasoline sales in the nation take place in one market. Both positions are overstated. Almost everywhere in the United States, a person wishing to purchase gasoline can find both branded and unbranded dealers available. At all times, the consumer can purchase gas from either type of station. In that sense, there is one market for gasoline. However, many consumers have a strongly ingrained buying preference for major brand gasoline and will only depart from this habitual preference when the price differential between branded and unbranded gasoline becomes much greater. In this sense, branded and unbranded dealers comprise two submarkets

for the purchase of gasoline. Most consumers conduct their gasoline buying activities solely within one submarket unless the price differential between the two submarkets becomes so pronounced as to prompt a switch to another submarket. Conceivably, those who usually buy unbranded gasoline could switch to branded gasoline should branded gas become less expensive in relation to unbranded gas. Major brand customers appear willing to pay a few cents per gallon more for the satisfaction of consuming branded gas, for the convenience of making credit card purchases, for the availability of extra services, and their own self-assurance that the product may be of a higher quality.

Thus, price competition is keenest among dealers within the same submarket. However, dealers from different submarkets also compete with one another to a lesser extent because drivers will leave their usual submarket if the price rewards are great enough.

Dealers who have sales agreements with the branded oil companies purchase gasoline from the major brand companies for what is termed in the trade the dealer tankwagon price or retail tankwagon price (hereinafter "tankwagon price"). The tankwagon price is simply the wholesale price of gasoline, the price at which the oil company will sell its gasoline to its dealers. It is generally 20-to-30 cents per gallon below the price at the gas pump.

The tankwagon price is often modified by rebate programs operated by the major brands at various times. The rebate formulas of the major oil companies vary from time to time in response to market conditions. Most rebate programs are linked to the dealer's volume and performance. The rebate functions much like a quantity discount. For example, the rebate program most recently employed by Texaco reduced the tankwagon price by 4 cents for every gallon sold which exceeds 50 percent of the base period total and 6 cents for every gallon sold which exceeds by 80 percent the dealer's total gallonage for the base period. The base period is either the same month of

the previous year or the dealer's average per month gallonage of the previous year.

Texaco and other oil companies have in the past employed temporary rebate programs whenever they find themselves with an oversupply of gasoline. It is at these times that inter-brand price competition is most vigorous and the rebates are offered to enable each brand's dealers to compete more effectively with other dealers and to stimulate a high volume of sales. Oil companies prefer to offer quantity discount rebates rather than simply lowering the tankwagon price because it provides an incentive to increase sales and because the net price-reducing effect of rebates is less easily discerned by competing oil companies. The most recent rebate program of Texaco began in April, 1981, and remains in effect but may be withdrawn by Texaco at any time. The current rebate program is acknowledged by both Texaco and Texaco dealers to be one of the most favorable rebate programs in effect in today's market.

A gasoline retailer seeks, of course, to earn a profit in his station's operation. Regarding gasoline sales, a dealer's net profit will equal his earnings from gasoline sales at the pump price, minus the dealer tankwagon price and any other overhead costs such as station rental, wages, insurance, etc. Texaco dealers generally make a gross profit of between 15 and 25 cents per gallon on sales of full service gasoline (gasoline pumped by station employees who also clean the customer's windshield, check his oil, etc.) and 3 to 6 cents per gallon on self-service (gasoline pumped by the customer) sales. The pooled margin of dealers is the overall profit margin of the dealer on all gasoline sales, both self-service and full-service averaged together.

Those familiar with the gasoline market know that consumers will alter their gasoline purchasing behavior in response to changes in the price of gasoline. The Texaco dealers contend that Texaco's current 3 percent processing fee applied to credit card invoices results in an increase in the cost of gasoline to the Texaco dealer. Because it will cost more to sell gasoline on credit, Texaco dealers contend that they will either have to absorb the increase by accepting a reduced profit margin or raise the pump price of their gasoline. They claim that either alternative would be disastrous. The former course would, they assert, make operating a service station either unprofitable or so negligibly profitable that the dealers would soon cease operation. The latter course would result in Texaco retailers losing customers to other branded and unbranded dealers, which would also have an adverse impact on the Texaco dealers' profits. The Texaco dealers' contention would appear to be correct if Texaco did not intend to decrease its tankwagon price to reflect the additional 3 percent processing fee, or if the Texaco dealers were unable to adjust to the imposition of the 3 percent fee. The evidence shows that Texaco's present rebate program is effecting a reduction in the tankwagon price for those dealers who are able to qualify. However, the fact remains that each Texaco dealer must make a decision to either include the 3 percent charge as an overhead item, or to recoup it by adding it to the price charged for all gasoline sales, or to impose it solely on his credit card customers by offering a discount for cash sales. On the other hand, the Texaco dealers contend that although the present rebate program is providing them with a more favorable tankwagon price, they claim that there is nothing that prevents Texaco from terminating the rebate program at any time. Nevertheless, it is certainly reasonable to assume that as long as Texaco desires to market gasoline through the Texaco dealers, it must maintain a tankwagon price which will permit the Texaco dealers to remain competitive with other dealers and earn a profit margin that will enable them to remain in business.

It was shown at trial that Texaco dealers can, if they desire, operate cash-only gas pumps, either self-service or full-service, or both, and other pumps for credit card sales. The Texaco dealers contend, however, that to accomplish this the dealer must operate four separate gas pump islands, each offering Texaco's regular, premium, and lead-

free gasolines; a full-service credit card island; a full-service cash only island; a self-service credit card island; and a self-service cash only island. They contend such an operation lies beyond the resources of most Texaco dealers since they generally have only two gasoline sales islands and lack the space, financial resources, or the volume of sales to enable them to expand to four gas islands. The evidence presented at trial, however, shows that most Texaco dealers will be able to operate cash only pumps, giving a discount for cash purchases of gas. Such an operation would be understood and accepted by many consumers. Furthermore, as the Court has found, Texaco dealers are not required to enter into the credit card agreement and may use any financial institution of their choice for processing bank and other credit cards for collection.

The Texaco dealers contend that the gas-buying public is now conditioned to expect that their oil company credit cards will be honored by the service stations carrying that brand of gasoline. The Court finds the evidence presented at trial to support this view. The pervasiveness of this perception cannot be precisely known at this time, but it is likely widespread. More than 20 years of extensive advertising and promotion on behalf of credit cards, coupled with long-standing dealer acceptance of credit cards for gasoline purchases, has given rise to this consumer perception.

The Texaco credit card itself states that it will be honored by *participating* retailers. Thus, the actual plastic credit card issued by Texaco does not, by its language, dispel the expectation that all Texaco dealers will always accept Texaco credit cards. During the period 1958–74, the language on the back of the Texaco credit card stated that the card would be honored at all Texaco dealers throughout the United States. In 1974, Texaco unilaterally altered this language by inserting the word "participating" before the word "dealers." This change was prompted by the refusal of some dealers to honor Texaco credit cards during the 1973–74 Arab oil embargo gas shortage, when dealers sought to expedite the move-ment of long gas lines through cash sales. Texaco contends that neither the credit card agreement currently used by Texaco, nor the language of the credit cards currently issued by Texaco, compels Texaco dealers to accept all Texaco credit cards under all circumstances.

The agreement specifically states that

Texaco hereby authorizes Retailer to honor at his place of business unexpired and uncancelled Texaco Travel Cards and any other special credit cards authorized by Texaco, for the sale on credit (of goods and services).

Ex. P–5, Clause (1)

However, it may well be that a consumer pulling into a neighborhood service station will reasonably expect that the station will accept his credit card for that brand of gasoline unless prominent signs give him notice that the station has restricted its traditional acceptance of branded gasoline credit cards in whole or in part. Thus, with appropriate notice, Texaco dealers may overcome the expectation that the Texaco dealer must accept his Texaco credit card.

The evidence presented at trial showed that many Texaco dealers established cash only pumps or islands and that these dealers are experiencing increased overall gasoline sales and increased profits despite the 3 percent processing fee for credit cards instituted on November 1, 1981. Based on all of the evidence, the Court concludes that Texaco's imposition of a 3 percent charge for processing credit card sales will not result in reduced profits for Texaco dealers provided that Texaco continues to keep its tankwagon price at a level that will compensate the Texaco dealers for the imposition of the 3 percent processing fee on credit cards. As heretofore observed, strong competitive pressures will likely compel Texaco to continue its adjustment in tankwagon price, most probably through the continued use of rebates. The recent alteration in Texaco's credit card program in fact gives the Texaco dealers an opportunity to adopt innovations in gasoline marketing and pricing because the cost of credit

sales is no longer included in the tankwagon cost of gasoline to the Texaco dealers. Since November 1, the dealer has been able to specifically identify the cost to him of a credit card sale of gasoline. The dealer may now respond to that knowledge in the manner that he feels will best benefit his service station's operation. That response may take the form of a discount for cash sales, a higher per gallon price for all sales, refusal to accept credit cards, or acceptance of credit cards only for certain purchases.

Many credit card purchasers in the United States have long received a subsidy at the expense of those consumers who have been paying cash for the product. In effect, the cash customers, by paying a price made higher because of the cost of operating a credit program, have been subsidizing the extension of credit to all credit card purchasers. In the past, dealers in gasoline could have eliminated this subsidization by giving a discount to the consumer who purchased for cash. However, prior to November 1, 1981, the Texaco dealers had no incentive to do this since Texaco imposed only a nominal charge ($36 per year) for processing and collecting on credit cards. The cost of the credit card program prior to November 1, 1981 was not specifically passed on to the Texaco dealers but was included in the tankwagon price or otherwise borne by Texaco. Since November 1, 1981, the Texaco dealer is well aware that he must bear most of the cost of processing credit card sales. The current Texaco credit card program eliminates the Texaco dealers' incentive to continue imposing on all gas buyers the costs of processing and collecting for credit card sales. Texaco dealers since November 1, 1981, have the option to continue the practice of spreading the cost of credit cards among Texaco consumers of gasoline. Texaco's 3 percent processing fee does not require their dealers to do this. Indeed, to the extent that the Texaco dealers contend that the 3 percent processing fee compels them to offer a discount for cash purchases, this contention acknowledges the equity of eliminating what some consider a discriminatory practice of assessing cash buyers of gasoline the cost of processing credit cards.

Although this case does not directly involve the Cash Discount Act, P.L. 97–25, 15 U.S.C. § 1601 *et seq.*, enacted by the United States Congress on July 27, 1981, it does deal with the overall and important policy question of cash and credit purchases of consumer goods, the relative costs of these goods, alternative purchasing methods, and government's role in encouraging or discouraging particular transactions and systems of payment.

The Cash Discount Act amended the Truth in Lending Act, which had prohibited a retailer from placing a surcharge on credit sales for goods but permitted a maximum discount of 5 percent to purchasers who paid cash for goods. The Cash Discount Act eliminates this 5 percent maximum discount and permits retailers to offer as great a cash discount as they deem appropriate. In passing the act, Congress noted that the bill "allows the competitive free market to operate" by permitting retailers to offer different cash and credit prices reflecting the costs of operating a credit program. *See* S.Rep.No. 23, 97th Cong., 1st Sess. 4, *reprinted in* 7B U.S.Code Congressional and Administrative News 74, 77 (1981).

Purchasing on credit and the use of credit cards is pervasive in America. Since credit cards were first issued in the early 1900s, their use has grown steadily. During the 1970s, credit card use grew at an average annual rate of 12.2 percent. *See* Garcia, *Credit Cards: An Inter-disciplinary Survey*, 6 Journal of Consumer Research 327 (1980). It has been estimated that more than half of the residents of the United States hold a major oil company credit card. Forty percent hold a bank company credit card such as Visa or Mastercard. The proportion of products purchased through the use of a credit card varies by goods and also varies by region. Though credit card purchasing has long been a part of American retailing, scholars have begun to question the efficiency and fairness of the failure of many retailers to specifically allocate the cost of credit. As has been observed:

The costs of the credit operations [of a seller] include not only direct operating expenses, but also the interest foregone on balances due between the date of purchase and the due date of the bill. Ultimately, of course, all costs will be borne by consumers in the price of the seller's product. However, while all customers share in the burden of higher prices, only a subset of these customers—those using credit cards—partake in the benefits of credit cards [delayed payment, convenience, records of purchase, etc.] Hence the question: Why is it that sellers do not levy all credit costs directly and solely on credit using customers?

Murphy and Ott, *Retail Credit, Credit Cards and Price Discrimination*, 43 Southern Economic Journal 1303 (1977).

Credit card use generally increases with the income, education, and social class of the user. Retired persons on limited income make less use of credit cards than those with more substantial earnings. *See* Garcia, *supra*, at 328. Some researchers have suggested that current credit card availability and use generally disadvantages poorer consumers as they cannot obtain credit cards but must pay a price for goods that is higher because of the costs of operating a credit card program utilized by the higher income persons holding credit cards. *See* S. R. Andersen, *The Disadvantaged Consumer*, (1975); D. Capolivitz, *The Poor Pay More* (1967).

As Murphy and Ott noted, one significant factor in American retail markets is

the availability of short term, interest free loans to credit card holders. As a result, users of credit cards receive an implicit discount on goods and services relative to those who do not hold credit cards. If such discounts cannot be explained in terms of concomitantly lower selling or transactions costs to sellers in accepting credit cards vis-a-vis other means of payment, a plausible case for price discrimination is developed. In this context, credit cards are seen as a method of separating elastic and inelastic demands, and simultaneously allowing dis-

counts to the former group, cardholders, for purposes of profitable price discrimination.

Murphy and Ott, *supra*, at 1312.

Texaco maintains that its revised credit card program attempts to rectify this flaw in the credit market and is consistent with the views of Congress as set forth in the Cash Discount Act. Prior to November 1, 1981, Texaco credit card customers received approximately 55 days of credit before incurring a service charge. This is typical of most credit card programs.

The Texaco dealers contend, however, that whatever the merit of the 3 percent processing fee, it will nevertheless impair the profitability of independent Texaco retailers, driving some out of business, and thereby result in harm to consumers by reducing competition in the gasoline market. The Texaco dealers contend that the 3 percent processing fee puts them at a competitive disadvantage relative to other dealers of branded gasoline because only Texaco currently imposes this sort of fee for processing credit card invoices. Texaco's recent imposition of the 3 percent processing fee was in part a response to the increased cost of administering a credit card program. Evidence presented at trial showed that Texaco has long considered implementing such a program but was unable to do so during most of the 1970s when oil companies were subject to a complicated series of price controls and other restrictions on their activity. *See, e.g.*, 10 C.F.R. § 210.62 (1973). The controls restricting specific allocation of gasoline credit card costs expired in January, 1981 and Texaco became free to implement this change.

Though Texaco is the first major brand oil company to utilize a fixed percentage processing fee as part of its entire gasoline credit card program, it may not be the last to adopt this approach. Higher interest rates and the increase in the overhead cost of administering the credit card program impelled Texaco to impose the 3 percent charge on November 1, 1981. Other oil companies may do likewise. Recently, other major brand companies have begun to

alter their credit card programs, some on an experimental basis. For example, Exxon has begun a credit program which charges interest to credit card purchasers commencing with the date the invoice is received by Exxon. Most credit card gasoline purchasers have heretofore not been charged interest until a period after they have been billed for the purchases. Amoco Oil Company is also experimenting with a credit plan that imposes a 4 percent processing fee on credit card invoices but adjusts the tankwagon price in light of this program. Mobil, Shell, and Arco assess a 3 percent fee for processing non-gasoline credit purchases. Texaco has itself charged a 3 percent processing fee on diesel fuel invoices since 1979. During that time, the number of Texaco dealers selling diesel fuel has nearly doubled.

On January 29, 1982, the Texaco dealers submitted to the Court a motion to admit at this stage of the proceeding what the dealers consider "newly discovered evidence." Texaco responded to this motion on February 3, 1982. The "newly discovered evidence" submitted by the dealers are memoranda prepared by Texaco which were in the files of Texaco and probably should have been turned over to the dealers during the course of discovery. Although the Court recognizes that a hearing would ordinarily be required to determine whether the Court should open this record and permit these memoranda to be received as evidence, the Court will nonetheless receive them into evidence in light of the fact that they are relevant, probably should have been provided in discovery, and are uncontested as to authenticity and accuracy of contents.

Upon careful examination of these memoranda, the Court has concluded that the "newly discovered evidence" does not change this Court's findings of fact and conclusions of law that the plaintiffs are not entitled to the relief requested. The Court finds credible the testimony at trial of the Texaco officials in connection with the cost of operating the credit card program. The newly admitted memoranda do show, however, that Texaco's agreement to process Visa and Mastercard will cost Texaco only 2.7 percent whereas those Texaco dealers who desire to process all their credit cards through Texaco will be charged a 3 percent processing fee. On the basis of other evidence in the record, the "newly discovered evidence" shows that the cost to Texaco of processing credit cards will not be as great as was testified to by the Texaco officials. The Court finds, however, that even assuming the accuracy of this newly admitted evidence, the 3 percent processing fee being charged by Texaco is not an unreasonable or unconscionable fee (see pp. 1295–1297, *infra*). As heretofore pointed out, the present prevailing fee which financial institutions charge for processing credit cards for collection ranges from 2.5 percent to 5 percent.

*The Issues of Law*

The Texaco dealers allege that Texaco's 3 percent fee to process the dealers' credit card invoices constitutes: (1) an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) an illegal tie-in in violation of 15 U.S.C. § 1; (3) an unconscionable contract in violation of 13 P.S.A. § 2302 (the state statute adopting Section 2–302 of the Uniform Commercial Code; and (4) an ineffective modification of a contract that is void for failure of consideration and is a contract of adhesion.

*Restraint of Trade*

The Texaco dealers allege that Texaco's revision of its credit card program constitutes a contract in restraint of trade in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. Section 1 states in relevant part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

The Texaco dealers assert that the standard form credit card agreement between Texaco and its dealers as modified on November 1, 1981, constitutes a contract that will reduce price competition in the retail

gasoline industry. The Texaco dealers maintain this will occur because they will be forced out of business in that their stations will become unprofitable due to imposition of the 3 percent charge for processing credit card invoices and that the Texaco dealers who survive will be unable to remain competitive because of the imposition of the 3 percent processing fee.

■ The Texaco dealers' theory of Section 1 is novel. Based on the evidence presented at trial, the Court finds that Texaco retailers will not be so disadvantaged by the 3 percent processing fee as to be emasculated as a competitive force in the gasoline market. Furthermore, even if the Court found that some of the Texaco dealers would be forced out of business as a proximate result of the imposition of the 3 percent processing fee by Texaco, Section 1 of the Sherman Act would probably not be violated.

To begin with, Section 1 requires more than the single action of one economic actor to create a restraint of trade. As the Third Circuit stated in *Edward J. Sweeney & Sons, Inc. v. Texaco*, 637 F.2d 105 (1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

> Unilateral action, no matter what its motivation, cannot violate § 1, *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068, 1072 (3d Cir. 1978); *Tripoli Co. v. Wella Corp.*, 286 F.Supp. 264, 266 (E.D. Pa.1968), *aff'd*, 425 F.2d 932 (3d Cir.), *cert. denied*, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970). By its terms, § 1 requires proof of a "Contract, combination ... or conspiracy." 15 U.S.C. § 1. We have noted that the statutory language presents a single concept about common action, not three separate ones, " 'contract ... combination or conspiracy' becomes an alliterative compound noun, roughly translated to mean 'concerted action.' " *Bogosian v. Gulf Oil Corp.*, 561

F.2d 434, 445–46 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978) (*quoting* L. Sullivan, *Law of Antitrust* 312 (1977)).

637 F.2d at 110–11.

In *Sweeney*, the Third Circuit enunciated a longstanding rule of Sherman Act Section 1 construction. Indeed, it is hornbook law that "[S]ection 1 requires duality of action. One person cannot contract, combine or conspire by himself; the essence of the offense is the act of joining together." E. Gellhorn, *Antitrust Law and Economics*, 22–23 (1976). *See also* 2 E. Kintner, *Federal Antitrust Law*, § 9.7 at 19 (1980). Were Texaco to act alone in the revision of its credit card program, such action on its part could not result in a violation of Section 1. "Section 1 focuses on restrictive agreements (wrongful purposes) while Section 2 examines the aggrandizement or misuse of monopoly power." E. Gellhorn, *supra*, at 23.

In *Sweeney*, the Third Circuit noted that plaintiffs, in order to prevail on their Section 1 claim, must submit sufficient evidence "from which a jury could reasonably infer that Texaco and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." 637 F.2d at 111. The dealers' allegation in the instant case fails the *Sweeney* test. Texaco, as a discrete and separate corporate entity, acted alone in revising its credit card program. It did not conspire with its dealers or anyone else to institute the 3 percent processing fee. Indeed, one of the chief complaints of the Texaco dealers in this case is that Texaco's action was undertaken unilaterally without prior consultation with them. The Texaco dealers contend that Texaco's isolated action demonstrates Texaco's superior market power over its dealers, market power which they argue justifies a finding of an illegal tie-in and an unconscionable contract (discussed *infra* pp. 1292–1295). The Court finds that Texaco initiated the 3 percent processing fee without consultation with its dealers.[1] There was

---

[1] The Texaco dealers contend that *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) supports their claim. *Perma Life* held that the doctrine of in pari delicto is not a defense to an antitrust action. 392 U.S. at 139–41, 88 S.Ct.

no "common scheme" or "conscious commitment to a common scheme" to jointly institute the 3 percent processing fee.

Although "courts have regularly embraced within the conspiracy concept ... unilateral action which compels an "agreed" course of action by another," P. Areeda, *The Rule of Reason in Antitrust Analysis: General Issues*, 17 (1981), this case does not present a situation of compulsion or coercion. Neither do the facts in this case present a situation of intra-enterprise conspiracy in any way resembling such conspiracies found to exist in other litigation. *See generally* P. Areeda, *Antitrust Analysis*, § 334, at 395–406 (3rd ed. 1981). That some courts have found a conspiracy to exist within a business entity or between a supplier and its dealers indicates only that membership in the same business family does not automatically immunize intra-enterprise defendants from scrutiny under Section 1 of the Sherman Act. P. Areeda, *supra*, at 402. On the basis of the evidence presented in this litigation, the Court finds no concerted action to restrain trade and therefore no violation of Section 1 of the Sherman Act.

▪ The antitrust laws are "designed for the protection of competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). In reviewing a Section 1 claim, the Court must examine the challenged practice in light of its impact on the public and competition generally, not its effect on a particular businessman or, as in this case, a group of dealers. *See Sitkin Smelting and Refining Co. v. FMC Corp.*, 575 F.2d 440, 448 (3d Cir. 1977); *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1977); *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230 (3d Cir. 1975). In order to assess the impact upon competition of Texaco's imposition of a 3

percent processing fee for credit cards, the Court must determine the relevant product market. The Court finds that the relevant product market in this case is all retail gasoline sold in regions of the nation where Texaco is engaged in the distribution of gasoline to its dealers.

As the Third Circuit recently stated, the relevant product market is to be defined in terms of cross-elasticity of demand. The court must ask "can the consumer of the product switch easily to a substitute product? *Larry Muko, Inc. v. Southwestern Pennsylvania Building and Construction Trades Council*, 670 F.2d 421, at 434 (3d Cir. 1982). Though *Muko* posed this question in the context of a Section 2 monopolization claim, this definition of product market is equally applicable in a Section 1 claim. *See Muko, supra*, at 434. According to the Third Circuit:

defining a relevant product market is a process of describing those groups of producers which, because of the similarity of their product, have the ability—actual or potential—to take significant amounts of business away from each other. A market definition must look at all relevant sources of supply, either actual rivals or eager potential entrants to the market.

*Smith Kline Corp. v. Eli Lilly and Co.*, 575 F.2d 1056, 1063 (3d Cir.), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978). Applying this standard, this Court finds, for purposes of analyzing the Section 1 Sherman Act claims of the Texaco dealers, the relevant product market is the retail sale of gasoline in the regions of the nation where Texaco markets gasoline.

Thus, for Texaco's conduct to violate the Sherman Act, the 3 percent processing fee must do more than make successful business operation difficult for Texaco's dealers—it must hinder competition in a way

---

at 1984–1985. Thus, if Texaco and its dealers had engaged in concerted action to restrain trade, the dealers' involvement would not prevent them from successfully bringing suit against Texaco. However, the evidence presented at trial showed no concerted action between the parties. In *Perma Life*, the plain-

tiffs were found to have willingly joined with the defendants in a long-running series of acts alleged to have restrained trade. 392 U.S. at 138, 88 S.Ct. at 1984, citing Seventh Circuit opinion, 376 F.2d at 699. Since that situation is not before this Court, *Perma Life* is not applicable to this case.

that harms the public and is not justified by the rule of reason. *See Standard Oil Co. of N. J. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); E. Gellhorn, *supra*, at 24, (in Section 1 claims, the Supreme Court has adopted a flexible rule of reason, reading the statute as condemning only unreasonable business conduct). *Kestenbaum v. Falstaff Brewing Corp.*, 575 F.2d 564, 571 (5th Cir. 1978), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979) (emphasis under rule of reason is on market impact; "Dealings between a manufacturer and its agents may be arbitrary, unfair, or lacking in good business judgment, but, without more, they will not violate the Act.").

Furthermore, the revision in Texaco's credit card program sought no unlawful objective. Obviously, the 3 percent processing fee was not designed to unfairly harm Texaco's competitors, nor was it a plot to trick the consumer into buying an inferior or overpriced petroleum product. The processing fee fails to resemble in any way the usual actions in restraint of trade. The Texaco dealers have advanced an unusual restraint of trade theory. They suggest that though Texaco acted alone in planning the change in its credit card program, it forced its dealers through its market power to accept the terms of its credit card contract provision, thus creating concerted action. The Court has already rejected this contention. *See* pp. 1291–1292, *supra.* They then argue that the credit card program accomplishes an illegal restraint of trade by impairing the ability of Texaco dealers to compete in the retail gasoline market. They suggest that Texaco has embarked on a plan to vitiate the economic strength of its dealers, that it is in fact damaging its own affiliates in order to bring about reduced price competition in the retail gasoline market. The Texaco dealers urge the Court to conclude that Texaco is not a rational economic actor but a company bent on severely damaging itself so that all other branded dealers in the market will flourish. This record contains no evidence that even suggests a basis for such a theory.

*Illegal Tie-In*

The Texaco dealers also contend that the 3 percent processing fee constitutes a tie-in which violates Section 1 of the Sherman Act. According to Professor Gellhorn

A tying contract describes the situation where the seller of a product, such as a copying machine ... conditions the sale of the copier to the buyer's agreement to purchase all the paper used in the machine from the seller. That is, the seller of the copier ties the sale of a tying product (the copier) to the buyer's purchase of the tied product (the paper).

E. Gellhorn, *Antitrust Law and Economics*, 277 (1976).

The dealers assert that Texaco gasoline is a tying product, and Texaco's credit card program is the tied product. They maintain that Texaco gasoline is so necessary and/or desirable to Texaco dealers that they must have the tying product, so much so that they will accept an undesired tied product as a condition of obtaining the tying product.

The prohibition against tie-ins does not arise from any specific statutory language but emerges from judicial construction of both the Sherman Act and the Clayton Act. The Texaco dealers claim that the alleged Texaco gas and credit card tie-in violates Section 1 of the Sherman Act in that it restrains trade by forcing Texaco dealers to accept the 3 percent processing fee as a condition of their being able to sell Texaco gasoline.

To establish a tie-in, there must exist "an agreement by a party to sell one product but only on the condition that the buyer also purchases a differed (or tied) product." *Northern Pacific Railway v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). This Court has found that Texaco has not conditioned the sale of its gasoline on the processing of credit card invoices with Texaco. An analysis of the credit card and sales agreements as well as the language of the credit card itself shows that Texaco dealers are not required to enter into the credit card agreement but in the event they do execute the

credit card agreement, they may nevertheless elect not to accept the Texaco credit cards for purchases. Thus, there exists no tie-in whatsoever.

As this Court has found, Texaco has simply amended its credit card agreement to increase the cost of processing invoices from $36 per year to 3 percent of the face value of the invoices. This is not a sale of a tying product because it is in no way conditioned on Texaco dealers being required to process credit card invoices with Texaco. As this Court has found, one can become a Texaco dealer without executing the Texaco credit card agreement and Texaco dealers are not required by any agreement with Texaco to process Texaco credit cards through Texaco unless they decide to do so. The Court recognizes, however, that for most Texaco dealers, it is economically beneficial to honor Texaco credit cards and process them for collection through Texaco. Nevertheless, there is no evidence in this record supporting coercion as is required by law to show a tie-in. *See American Manufacturers Mutual Ins. Co. v. American Broadcasting—Paramount Theaters, Inc.*, 446 F.2d 1131, 1137 (2d Cir. 1971), *cert. denied*, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972); *Belliston v. Texaco, Inc.*, 455 F.2d 175, 186 (10th Cir.), *cert. denied*, 408 U.S. 928, 92 S.Ct. 2494, 33 L.Ed.2d 341 (1972). What the Texaco dealers are contending in effect is that they want to accept Texaco credit cards but instead of paying the 3 percent fee, they would prefer to have the cost of processing the credit card for collection included in the tankwagon price as had been done prior to November 1, 1981.

The Texaco dealers have failed to present credible evidence that they have been coerced into accepting the 3 percent processing fee. The fact that Texaco has agreed to process Texaco credit cards for a 3 percent fee while most financial institutions in the business of processing credit card invoices are charging 2.5 percent to 5.0 percent cannot be interpreted as coercion. As the Third Circuit observed in *Ungar v. Dunkin Donuts of America, Inc.*, 531 F.2d 1211 (3d Cir. 1976), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976), the seller with market power in one market must use that power as a lever to force acceptance of his product in another market before a tie-in can be found to exist. "If the product in the second market would be accepted anyway, because of its own merit, then, of course, no leverage is involved...." *Id.* at 1218.

The Texaco dealers place some reliance on *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). *Fortner* held that a company could be possessed of sufficient market power with respect to a tying product even though that company does not possess a monopoly or dominant position in the market for the tying product. However, the Supreme Court in *Fortner* premises all its discussion concerning tie-ins that are violative of Section 1 on the condition that the plaintiff must first prove a "tie-in." As this Court has heretofore determined, the evidence in this case does not support a finding that the credit arrangement at issue is a tie-in, since the Texaco dealers are not required to enter into the credit card agreement, are not required to accept Texaco credit cards, and may process for collection bank and other credit cards through any institution of their choosing. Furthermore, *Fortner* focused on the requirements that must be satisfied if a plaintiff is to show a per se violation of Section 1. The Texaco dealers have not contended that any action of Texaco in this case constituted a per se violation.

*The Sherman Act and the Public Interest*

In evaluating the Section 1 claims advanced by the Texaco dealers, the intent and purpose of the Sherman Act must be considered. As heretofore pointed out, the Sherman Act was enacted by Congress to preserve competition as a protection for the consuming public. *Brown Shoe Co. v. United States, supra*. During this century, although there have been some changes in the legal interpretations of some portions of the antitrust laws, the Supreme Court has consistently held that

The fundamental purpose of the Sherman Act was to secure equality of opportunity and to *protect the public* against evils commonly incident to destruction of competition through monopolies and combinations in restraint of trade.

*Charles A. Ramsey Co. v. Associated Billposters of United States & Canada,* 260 U.S. 501, 512, 43 S.Ct. 167, 168, 67 L.Ed. 368 (1923) (emphasis added). Senator Sherman, the author of the Act, expressed this same view. He stated that the purpose of his bill was to "prevent and control combinations made with a view to prevent competition or for the restraint of trade, or to increase the profits of the producer *at the cost of the consumer.*" 21 Cong.Rec. 2457 (1890). *See also* 1 P. Areeda and D. Turner *Antitrust Law* 7–8, 23 (1978); L. Sullivan, *Antitrust* 14 (1977); E. Kinter, Federal Antitrust Law § 9.7 at 19 (1980).

■ Based on the evidence presented at trial, the Court has concluded that the consuming public will not be harmed by Texaco's replacement of the $36 per year credit card processing fee with the 3 percent processing fee. The Texaco dealers have not presented to this Court evidence sufficient to find that any goal of the antitrust laws has been contravened.

As this Court observed in its findings of fact, Texaco's 3 percent processing fee is consistent with public policy as embodied in legislation such as the Cash Discount Act. *See* pp. 1281–1289, *supra.* By separating the cost of credit from its tankwagon price for gasoline, Texaco has removed a previously existing incentive which encouraged dealers to price gasoline in a manner that resulted in cash buyers subsidizing those who purchased gasoline for credit. As many scholars have noted, *see* p. 1289, *supra,* such pricing policies tend to result in cash consumers subsidizing the credit purchases of credit card consumers. It would be inconsistent with the purpose of the Sherman Act for a federal court to enjoin an otherwise legal and reasonable business practice which removes one incentive for credit price discrimination, and appears to further the interests of the consuming public.

*Unconscionability*

The Texaco dealers also claim that the credit card agreement which most of them have executed constitutes an unconscionable contract and they request the Court to declare the agreement void or to declare Clause (9) of the agreement (the 3 percent processing fee) unenforceable.

In 1966, the Uniform Commercial Code was amended by adding a section regarding unconscionable contracts. Pennsylvania has substantially adopted this U.C.C. provision in its commercial code. The parties agree that Pennsylvania law applies in this matter of contract construction, a subject of state rather than federal law. The named plaintiffs reside in Pennsylvania, their contracts were entered into in this state, Texaco does business in this state, and Pennsylvania has a strong governmental interest in the outcome of this litigation. Pennsylvania's Commercial Code states in relevant part:

If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may (1) refuse to enforce the contract; (2) enforce the remainder of the contract without the unconscionable clause; or (3) so limit the application of any unconscionable clause as to avoid any unconscionable result.

13 Pa.C.S.A. § 2302.

In *Witmer v. Exxon Corp.,* 495 Pa. 540, 434 A.2d 1222 (1981), the Pennsylvania Supreme Court defined unconscionability and interpreted Section 2302. The Court adopted the "classic and oft-quoted" definition of unconscionability formulated by Judge Skelly Wright of the District of Columbia Circuit in *Williams v. Walker-Thomas Furniture Company,* 350 F.2d 445 (D.C.Cir. 1965):

Unconscionability has generally been recognized to include an *absence of meaningful choice* on the part of one of the parties together with contract *terms which are unreasonably favorable to the other party.*

434 A.2d at 1228, quoting *Williams v. Walk-er-Thomas, supra* (emphasis the Supreme Court's).

At issue in *Witmer* was Exxon's standard form lease agreement with its dealers. The lease agreement provided that Exxon could increase the rent up to a maximum increase per lease term of one cent per gallon sold at that dealer's station and that, if the dealer did not agree to the proposed increase, he could terminate his lease with Exxon, without liability. The Court held this provision in the lease was not unconscionable. Said the Court:

> Appellants allege that Exxon was able to include the rental reopener clause in several of the leases because of its economic superiority. This Court and the federal courts in Pennsylvania, however, have refused to hold contracts unconscionable simply because of a disparity in bargaining power. *See, e.g., Goldinger v. Boron Oil Co.*, 375 F.Supp. 400 (W.D.Pa. 1974), *aff'd* 511 F.2d 1393 (3d Cir. 1975); *K & C, Inc. v. Westinghouse Electric Corp.*, 437 Pa. 303, 263 A.2d 390 (1970). Nor, in any case, could we conclude that the terms of the rental reopener clause are unreasonably favorable to Exxon. Exxon was not free under the clause to raise appellants' rents at its whim, but could do so only once during the lease term and to a maximum of one cent per gallon.

434 A.2d at 1228.

■ Clause (7) of the standard form credit card agreement between Texaco and its dealers specifically provides that Texaco may modify the agreement at any time. It is not unconscionable, as it is not unreasonably favorable to Texaco. If Texaco had irrevocably committed itself to clause (8) of the agreement (the $36 per year fee now deleted) it would never have been able to charge its dealers more than $36 per year for the processing of potentially millions of credit card invoices. Texaco incurred for 1981 an estimated annual cost of $114 million for administering and financing its credit card program. If the 3 percent processing fee had been in effect for all of 1981, Texaco would have incurred costs of $48 million over and above all its revenues from its credit card program. (N.T. at 1104–06). Therefore, the 3 percent processing fee now contained in clause (9) of the credit card agreement is not itself unreasonably favorable or unconscionable.

Evidence discovered after trial and duly admitted by the Court in the interests of justice suggests that Texaco will earn a profit on Visa and Mastercard transactions (memorandum to Ellis Gunnells from J. W. Cox). Texaco estimated that the difference between the 3 percent fee it charges to process Visa and Mastercard invoices and the 2.7 percent that Texaco pays to the First National Bank of Louisville as its processing agent will result in a net profit to Texaco of approximately $880,000 per year. However, Visa and Mastercard purchases accounted for only 6 percent of Texaco products purchased on credit in 1979, the last year in which Texaco processed Visa and Mastercard invoices. Thus, even if Texaco earns a small profit on the processing of Visa and Mastercard, there is no evidence in the record showing the 3 percent processing fee to be unconscionable.

Furthermore, the Pennsylvania Supreme Court's definition of unconscionability is predicated upon "absence of meaningful choice." Texaco's initiation of the 3 percent processing fee is not automatically imposed upon the dealer. As heretofore pointed out, Texaco dealers are not required to enter into the credit card agreement and have the option of accepting the Texaco credit card for purchases as well as the option of accepting other credit cards and processing such other credit cards for collection by any one of the many financial institutions in the business of processing credit cards for collection. A contract clause can hardly be considered unconscionable if one party to the contract can avoid the clause's application entirely.

While Texaco may well be a more sophisticated business entity than any of its dealers, the dealers themselves are not unsophisticated. Many of the Texaco dealers have successfully operated Texaco service

stations for more than 20 years. They have engaged in many contract negotiations with Texaco. Most of the Texaco dealers who testified at trial stated that they had consulted with their attorneys before entering into the credit card agreement. The 3 percent processing fee provided by clause (9) of the credit card agreement is not unconscionable under the law of Pennsylvania.

*Amendment of Contract Unsupported by Consideration—Contract of Adhesion*

The final contention of the Texaco dealers is that Texaco's action in amending the credit card agreement pursuant to clause (7) by deleting clause (8) and replacing it with clause (9), providing a 3 percent processing fee in lieu of the $36 per year fee is invalid because it lacks consideration.

This issue presents a question of state law and, for the reasons discussed in connection with the dealers' claim of unconscionability, this issue must likewise be determined on the basis of Pennsylvania law. *See Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205 (3d Cir. 1970), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55.

It is, of course, hornbook law that a contract generally requires consideration on both sides in order to be enforceable. A. Corbin, *Corbin on Contracts* §§ 109–127 (1952). The credit card agreement that was executed by most Texaco dealers was a contract supported by consideration on both sides. In that agreement, Texaco agreed, among other things, to process for collection Texaco credit cards for a fee of $36 per year. The Texaco dealers agreed to pay $36.00 per year in the event they determined to accept Texaco credit cards in payment for Texaco products and process these credit card invoices for collection through Texaco.

As heretofore pointed out, clause (7) of the credit card agreement provides "Texaco reserves the right to modify this agreement by written notice to Retailer. In deleting clause (8) and replacing it with clause (9) Texaco was merely exercising the contractual right which it reserved to itself to change the amount of the fee it charges for processing credit card invoices. Texaco proceeded pursuant to clause (7) to notify the dealers on August 31, 1981 that because of the increased costs of operating its credit card program, the processing fee would, effective November 1, 1981, be 3 percent of the face value of invoices submitted for processing.

■ Pursuant to the credit card agreement as amended effective November 1, 1981, Texaco agrees that it will continue to accept Texaco credit card invoices for processing, and in the event Texaco dealers elect to have these invoices processed for collection by Texaco, the dealers agree to pay a 3 percent fee for these services and to submit such invoices in accordance with the procedures set forth in the credit card agreement. Texaco's credit card agreement as so amended is supported by consideration.

The dealers also allege that the credit card agreement was a contract of adhesion because of the disparity of bargaining power between Texaco and the Texaco dealers, and claim the Court should therefore enjoin Texaco from imposing the 3 percent fee. The Texaco credit card agreement is a standard form agreement and the evidence in this case supports the Texaco dealers' contention that it was a "take-it-or-leave-it" agreement in that its terms were not negotiable. It would appear therefore that the Texaco credit card agreement fits well within the definition of a contract of adhesion. *See Corbin on Contracts*, § 559C at 327 (1980 Supp.).

■ However, a contract is not invalid merely because it is a contract of adhesion. "[F]inding a contract to be one of adhesion means nothing more than that the court must review its terms for fairness...." *Corbin on· Contracts*, § 559C at 327 (1980 Supp.). In determining fairness and the proper meaning to give to the words of the contract, ambiguities will be construed against the party that drafted the contract. *Egyptian Sands Real Estate, Inc. v. Polony*, 222 Pa.Super. 315, 294 A.2d 799, 803 (Pa.Sup.Ct.1972). To be fair, a

contract of adhesion must not give one party all the benefits while giving the other party all of the burdens of the contract. *Corbin, supra*, § 559F at 331. The terms of a contract of adhesion must be reasonably adapted to advance a legitimate purpose of the party that drafted the contract. *Corbin, supra*, § 559G at 331.

■ The evidence presented at trial shows that Texaco drafted the credit card agreement form with several legitimate purposes in mind. Foremost among these was a desire to avoid being locked in to the $36 per year processing fee. Clause (7) of the agreement, which permits Texaco to modify the contract, and clause (9) which establishes the 3 percent processing fee, are not ambiguously worded, nor are they hidden from view. A prospective Texaco dealer could easily have read and understood these clauses and the entire agreement before agreeing to enter into the contract. Clauses (7) and (9) are not unfair to either party. Neither party shoulders all of the burdens or enjoys all of the benefits of the contract. The 3 percent processing fee is more favorable to Texaco than was the $36 per year fee, but on the basis of the evidence in this record, it nevertheless is a fair fee for processing credit cards for collection. As heretofore pointed out, the fee for processing and collecting credit card invoices through financial institutions ranges from 2.5 to 5 percent. Furthermore, as has been pointed out several times in this memorandum, there is no provision of the credit card agreement and no provision of any other contract entered into by the Texaco dealers which requires them to process credit card invoices for collection through Texaco.

Texaco's revision of the credit card agreement was legal and proper in all respects. The Court finds no merit in the dealers' claim of improper contract modification.

*Summary*

The Texaco dealers allege five grounds as a basis on which this Court should enjoin Texaco from imposing the 3 percent fee on the processing of Texaco credit cards. These grounds are (1) restraint of trade in violation of Section 1 of the Sherman Act; (2) an illegal tie-in in violation of Section 1 of the Sherman Act; (3) promissory estoppel; (4) unconscionability; and (5) that the contract lacks consideration and is a contract of adhesion. The dealers voluntarily withdrew the promissory estoppel ground at trial. The Court finds and concludes, for the reasons heretofore set forth, that the Texaco dealers are not entitled to the injunctive relief requested in that they have not proved by a preponderance of the evidence facts sufficient to support any one of their four claims for injunctive relief. An appropriate Order will be accordingly entered. This Memorandum and Order shall constitute the Court's findings of fact and conclusions of law, pursuant to Rule 52(a), Federal Rules of Civil Procedure.