**WOODBURY DAILY TIMES CO., INC., A New Jersey Corporation t/a The Gloucester County Times, Plaintiff,**

v.

**LOS ANGELES TIMES–WASHINGTON POST NEWS SERVICE, Douglas A. Gripp, individually and jointly, Defendants.**

Civ. A. No. 84–4057.

United States District Court, D. New Jersey.

Aug. 16, 1985.

Thomas H. Ward, P.C., Woodbury, N.J., for plaintiff.

George F. Kugler, Jr., Archer & Greiner, Haddonfield, N.J., and Daniel K. Mayers, Christopher R. Lipsett, Stephen J. Schnably, Wilmer, Cutler & Pickering, Washington, D.C., for defendants.

## OPINION

BROTMAN, District Judge.

This is an action brought under the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*, for injunctive relief and money damages. Plaintiff, publisher of the *Gloucester County Times*, a Gloucester County, New Jersey newspaper, alleges that the exclusive territorial subscription granted to the *Philadelphia Inquirer* by defendant, the Los Angeles Times-Washington Post News Service, constitutes an unreasonable restraint of trade in violation of the Sherman Act. Defendants move to dismiss this complaint for failure to state a claim, or in the alternative, for summary judgment. For the reasons provided below, the court will grant defendants' motion for summary judgment.

### FACTUAL HISTORY

Plaintiff, Woodbury Daily Times Co., Inc., ("Woodbury"), is the publisher of the *Gloucester County Times*, ("*Times*"), an afternoon weekday and Sunday newspaper with primary circulation in Gloucester County, New Jersey. The principal defendant is the Los Angeles Times-Washington Post News Service, ("LAT–WP"), which provides two supplemental news services by wire to domestic newspaper subscribers. LAT–WP's general news service, intended to supplement basic newswire coverage, consists of copyrighted articles written primarily by the staffs of the newspapers owned by the Times Mirror Company and the Washington Post Company. LAT–WP's ALL–SPORTS! service provides sports news only, drawn from the same two sources. The cost of each service varies and is based primarily on the circulation of the subscribing newspaper. Douglas A. Gripp, a vice-president of LAT–WP who handled the contact with the *Times*, has also been named as a defendant. Although not a party to the suit, the *Philadelphia Inquirer*, ("*Inquirer*"), is central to the dispute. The *Inquirer* is a morning newspaper published seven days a week, serving the Philadelphia metropolitan area. The *Inquirer* has been a subscriber to LAT–WP's general news service since 1962, and has exclusive rights to this service in the Philadelphia metropolitan area. According to the agreement between the *Inquirer* and LAT–WP, the general news service cannot be sold to any other newspaper published within the defined metropolitan region. In October 1984, the *Inquirer* began subscribing to the ALL–SPORTS! service, under the same condition of exclusivity.

On May 6, 1984, David C. Fiedler, Editor of the *Times*, called Douglas Gripp to inquire about subscribing to LAT–WP. The following day, Gripp wrote Fiedler about the two services and offered the *Times* a subscription to either or both services. After sending the letter, Gripp discovered that the *Times* was published within the area in which the *Inquirer* has an exclusive subscription. On May 8, 1984, Gripp telephoned Fiedler to explain that LAT–WP could not provide its service to the *Times* because of the exclusivity provision in the *Inquirer*'s subscription contract. In a May 10, 1984 letter, Gripp confirmed the telephone conversation of May 8th, and stated that LAT–WP would ask the *Inquirer* to waive exclusivity in Gloucester County in order to permit the *Times*'s subscription to the service. In a May 15, 1984 letter to Gripp, Fiedler reiterated the *Times*'s desire to subscribe to the news service along with the sports service, to which the *Inquirer* had not at that time subscribed. In a June 15, 1984 letter, Gripp informed Fiedler that the *Inquirer* refused to waive exclusivity with regard to the general news service. Gripp also reported that LAT–WP was not willing to offer the *Times* ALL–SPORTS! because the *Inquirer* was considering subscribing to it and because LAT–WP was developing the new sports service to be marketed as a supplement to the general service, and not as a distinctly separate service. On October 1, 1984, plaintiff instituted this lawsuit.

## SUMMARY

Plaintiff alleges that defendants' exclusive contracts violate the Sherman Act, 15 U.S.C. § 1 *et seq.* Defendants argue that the Copyright Act, 17 U.S.C. § 101 *et seq.* permits the exclusive arrangement with the *Inquirer,* and that even if grants to use copyrighted materials on an exclusive basis are subject to antitrust restrictions, the degree of exclusivity granted in this case is reasonable.

The relationship between the exclusivity provisions sanctioned under copyright law and the monopolies banned under antitrust law has not been fully defined and delineated in case law. No bright line distinguishes the permissible from the impermissible when considering territorially exclusive, and hence, monopolistic licenses of copyrighted materials. However, the disposition of this case does not depend on a solution to this complex problem. A monopolistic grant to use copyrighted materials that the Sherman Act forbids but the Copyright Act allows may one day squarely confront the courts and force judicial consideration of this conflict. However, because the court determines that defendants' conduct does not violate the Sherman Act, it need not address the copyright defense raised by LAT–WP.

## DISCUSSION

█ Summary judgment shall be granted when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of proof, and all doubts must be resolved in favor of the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Tomalewski v. State Farm Life Insurance Co.,* 494 F.2d 882 (3rd Cir.1974); *Smith v. Pittsburgh Gage and Supply Co.,* 464 F.2d 870, 874 (3rd Cir.1972). While summary judgment is to be used sparingly in those complex antitrust cases "where motive and intent play leading roles," and "the proof is largely in the hands of the alleged conspirators," *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), summary judgment is appropriate in those antitrust cases where "a trial would serve no useful purpose." *Lupia v. Stella D'Oro Biscuit Co., Inc.,* 586 F.2d 1163, 1167 (7th Cir.1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979). Such are the circumstances of this case.

█ Plaintiff opposes the motion for summary judgment on the ground that material facts remain in dispute, *i.e.,* whether the *Inquirer* is a substantial competitor in Gloucester County, whether the exclusivity granted to the *Inquirer* is broader than reasonably necessary, and ultimately, whether the *Inquirer* 's exclusive subscription to LAT–WP represents an unreasonable restraint of trade. While it is true that these issues are at the heart of this suit, this court notes that these are not issues of fact to be determined by a factfinder at trial, but issues of ultimate fact. An ultimate fact is

> "an outcome determinative fact, derived from historical facts by a process which 'implies the application of standards of law.' *It is a mixture of fact and law;* fact because it is derived by inference or reasoning from the evidence, and law because the derivation is informed by legal principles and policies, producing a fact of independent legal significance."

William W Schwarzer, *Summary Judgment under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 470 (1984) (emphasis added). The factual components of the issues at hand are undisputed: both plaintiff and defendants cite the same figures from the same sources with regard to circulation of the two newspapers in question. It is in the interpretation of these facts and in the application of the appropriate legal standards that the parties differ. The court may appropriately decide issues of ultimate fact on summary judgment, particularly in cases where the law content of the mixed question predominates. *International Salt Co., Inc. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947);

Schwarzer, *supra*, 99 F.R.D. at 472–75. This case, which calls for the application of antitrust law to undisputed facts, is thus properly decided on motion for summary judgment.

■■■ Under antitrust law, it is well-established that businesses have the right to deal with whom they choose, provided of course, that their decision does not restrain trade unlawfully. The Supreme Court early on enunciated the principle that

> [i]n the absence of any purpose to create or maintain a monopoly, the [Sherman A]ct does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal, ...

*United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). This concept has been reiterated by the Court in more recent considerations of antitrust matters:

> [A] manufacturer of a product other and equivalent brands of which are readily available in the market may select his customers, and for this purpose he may "franchise" certain dealers to whom, alone, he will sell his goods.

*United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 376, 87 S.Ct. 1856, 1864, 18 L.Ed.2d 1249 (1967), *rev'd on other grounds*, 433 U.S. 36, 58, 97 S.Ct. 2549, 2561, 53 L.Ed.2d 568 (1977). As a New York court stated, the cases involving exclusive territorial franchises

> do establish a rule that an exclusive dealership is valid under the antitrust laws even though it restrains trade, provided the restraint is not unreasonable.

*United States v. Chicago Tribune-New York News Syndicate, Inc.*, 309 F.Supp. 1301, 1307 (S.D.N.Y.1970). This case presents a situation of exclusive dealership. In order to determine the lawfulness of the agreement, the court must examine whether the exclusive LAT–WP subscription granted to the *Inquirer* unreasonably restrains trade and injures competition.

■■■ This action concerns matters other than price and involves a restraining agreement between two businesses on different levels of the market, that is, a vertical restraint. In judging concerted action on vertical nonprice restraints, the rule of reason standard applies, rather than a *per se* standard. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Bravman v. Bassett Furniture Industries, Inc.*, 552 F.2d 90, 101 (3rd Cir.1977) ("Neither an exclusive dealing requirement nor a territorial sales solicitation requirement has ever been held by the Supreme Court to be a *per se* violation of the antitrust laws."). In order to prevail under the rule of reason standard, after showing the existence of a contract, combination or conspiracy which injures or decreases competition, plaintiff must prove that the challenged restraint is unreasonable, and therefore illegal, by showing (1) that the restraint applies to those businesses not in substantial competition with each other, or (2) that the granted exclusivity is unreasonable under the circumstances. *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 146, 68 S.Ct. 915, 923, 92 L.Ed. 1260 (1948); *Continental T.V., Inc., supra*, 433 U.S. at 49–59, 97 S.Ct. at 2557–62; *Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72, 81 (3rd Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978).

## Substantial Competition

Plaintiff alleges that the *Inquirer* is not a substantial competitor in Gloucester County and that therefore the grant of the exclusive use of LAT–WP services in that county is an unreasonable trade restriction upon the flow of news.

Both the *Times* and LAT–WP present circulation figures compiled by the Audit Bureau of Circulation ("ABC") to support their respective positions. The ABC defines the primary market areas for the two papers concerned and shows their circulation as follows:

## TABLE 1 *

Total Average Paid Circulation in Primary Market Area (PMA) for 12 months ended
March 31, 1984

| | Occupied Households in PMA 1984 ABC estimate | Mon.–Fri. | Sat. | Sun. |
|---|---|---|---|---|
| Times   (PMA = Gloucester County, New Jersey) | 69,800 | 26,694 | —** | 28,292 |
| Inquirer (PMA = eight–county area including Gloucester County) *** | 1,636,400 | 475,817 | 414,129 | 875,478 |

* Prepared from information presented in the Declaration of James W. Artz, Senior Vice President and General Counsel of Philadelphia Newspapers, Inc., publisher of the Philadelphia Inquirer, December 21, 1984, Appendices B and E.

** The Times does not publish on Saturdays.

*** The Inquirer PMA consists of Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties in Pennsylvania, and Burlington, Camden, and Gloucester Counties in New Jersey.

## TABLE 2 *

Estimated Average Paid Circulation of the Inquirer in New Jersey Counties of its PMA

| County | Occupied Households 1984 ABC Est. | Morning / Penetration** | Sunday / Penetration | 6-Day Average Penetration |
|---|---|---|---|---|
| Burlington | 121,700 | 24,907 / 21.7% | 46,871 / 40.8% | 24.9% |
| Camden | 167,000 | 34,173 / 21.0% | 66,101 / 40.7% | 24.3% |
| Gloucester | 69,800 | 11,497*** / 17.7% | 24,435 / 37.5% | 21.0% |

* Prepared from information presented in the Declaration of Artz, ¶ 6 and Appendix C, p. 6.

** Penetration rate equals the number of papers sold within the county per the number of households in the county.

*** With regard to penetration in Gloucester County, defendants observe that 13.5% of all Gloucester County residents 16 and over (for a total of 11,209 workers) commute to work in Philadelphia. In the eight-county area, Gloucester County has the lowest percentage of residents who work in the county of residence (46.5%), suggesting that many commuters may purchase the Inquirer outside of Gloucester County. The figure above is thus a minimum; the penetration of the Inquirer in Gloucester County is probably even greater. (Declaration of Artz, ¶ 8 and Appendix D).

## TABLE 3 *

Paid Circulation of Major Papers in Gloucester County, New Jersey (reflecting only sales made within the county)

| Paper | Daily / Penetration | Sunday / Penetration |
|---|---|---|
| Times | 26,694 / 41.0% | 28,292 / 43.4% |

508

| Paper | Daily / Penetration | Sunday / Penetration |
|---|---|---|
| Inquirer | 11,497** / 17.7% | 24,435 / 37.5% |
| Camden Courier-Post | 15,848 / 24.3% | 16,819 / 25.8% |

\* Prepared from information presented in Declaration of Artz, ¶ 7.

\*\* <u>See</u> last note of Table 2.

An examination of the statutory history of the Sherman Act shows that "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal legalistic one. The geographic market selected must, therefore, both 'correspond to the commercial realities of the industry and be economically significant.'" *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 336–37, 82 S.Ct. 1502, 1529–30, 8 L.Ed.2d 510 (1962). In keeping with Congressional intent, the courts, in the same vein, have remarked that "[t]he geographic market encompasses the area in which the defendant effectively competes with other individuals or businesses for the distribution of the relevant product." *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 421 F.Supp. 237, 243 (D.N.J. 1976). Thus, no precise criteria exist to define the geographic area pertinent to a consideration of whether an exclusive subscriber or dealer is in substantial competition. In this case, each party prefers to define the relevant geographic market in the way most favorable to its own argument. Plaintiff relies heavily on the statistics for Gloucester County alone, or in the alternative, for Southern New Jersey. LAT–WP points to the PMA for the *Inquirer*, as defined by the ABC, and the Department of Commerce's definition of the Philadelphia metropolitan area, both of which include Gloucester County as part of the larger area.

Just as there are no definite criteria which lead to a precise definition of the relevant market, there is no numerical threshold to indicate the level of circulation at which a newspaper is deemed a substantial competitor. Woodbury emphasizes the *Inquirer*'s daily (*excluding* Sunday) penetration rate in Gloucester County, a figure of 17.7%. LAT–WP prefers to consider the penetration rate *including* Sunday circulation, which demonstrates that the *Inquirer* reaches an average 21.0% of the households in Gloucester County. The question of what may be considered a significant level of circulation arose in *United States v. Chicago Tribune-New York News Syndicate, Inc.*, 1975 Trade Cas. (CCH) ¶ 60,-185 (S.D.N.Y.1975). Although the case was ultimately settled by a consent decree, so that it has no binding effect beyond the parties involved, one of the guidelines accepted by the parties was that the *Boston Globe* could not claim exclusive rights to newspaper syndicated features in a county where the *Globe*'s combined daily circulation equaled less than 5,000 copies and less than twenty percent of the number of households in that county.\* LAT–WP also considers this twenty percent figure as significant. In general, the service does not grant exclusivity in a county where the subscribing newspaper has an average daily (including Sunday) penetration rate of less than approximately twenty percent. (Declaration of H.C. Thornton, President and Editorial Director of LAT–WP, December 19, 1984, ¶ 15).

This court holds that a circulation figure is not conclusive in and of itself. In certain markets, the circulation figure which indicates substantial competition may be high-

\* The consent decree was limited to features, which were defined to *exclude* "a supplemental news service or material received as part of a supplemental news service." The decree gave no reasons for this exclusion.

er or lower than the twenty percent figure used in the *Chicago Tribune* consent decree. In determining whether a newspaper is a substantial competitor one must consider not only circulation, but also the extent of local news coverage and the paper's attempts to treat the concerns of local residents. The record indicates that the *Inquirer* makes a particular effort to cover Southern New Jersey news events and to present entertainment and lifestyle information of interest to New Jersey residents. The paper puts out several special sections directed at New Jersey readers: "New Jersey/Metro," "Neighbors," and "Jersey Life." (Declaration of Artz, ¶¶ 9–16).

However the relevant geographic market is defined—whether as (1) the eight-county Philadelphia metropolitan area, (2) the counties of Burlington, Camden, and Gloucester in New Jersey, or (3) Gloucester County alone—this court must conclude that the *Philadelphia Inquirer* is a substantial competitor in Gloucester County. All factors, including circulation and extent of local coverage, strongly point to this conclusion. The Commerce Department considers Gloucester County part of metropolitan Philadelphia. The ABC considers the same eight-county area the PMA of the *Inquirer*. According to the six-day average penetration rate, the *Inquirer* reaches 21% of the households of Gloucester County. Even the 17.7% rate for weekday circulation must be viewed as a minimum figure, since it is only reasonable to assume that some portion of those 11,209 Gloucester County residents who work in Philadelphia purchase the *Inquirer* there. (Declaration of Artz, ¶ 8 and Appendix D). If only the Sunday circulation is considered, the *Inquirer* reaches 37.5% of Gloucester County households, a rate only 5% less than that of the *Times*, and nearly 12% more than the circulation rate of the *Camden Courier-Post*. Furthermore, the *Inquirer*'s contact with Gloucester County is not limited to selling papers there. The *Inquirer* covers the news events of the area and presents information of specific interest to Southern New Jersey readers. There is not a single fact in the record

which supports plaintiff's contention that the *Inquirer* does not substantially compete with the *Times* in Gloucester County.

## REASONABLENESS OF EXCLUSIVE SUBSCRIPTION

■ Plaintiff contends that even if the *Inquirer* is a substantial competitor in the Gloucester County market, the exclusive rights granted to the paper are unduly broad and therefore constitute an unreasonable restraint of trade. The language of § 1 of the Sherman Act which forbids "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce" prohibits not all contracts and combinations which restrict trade but only those that *unreasonably* restrain competition. *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Under the rule of reason, *all the circumstances* of a case must be weighed to decide whether a restrictive practice must be prohibited as an unreasonable restraint on competition. *Monsanto, supra*, 104 S.Ct. at 1469; *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 343, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1981); *Continental T.V. Inc., supra*, 433 U.S. at 49, 97 S.Ct. at 2557. Circumstances and the weight to be accorded them will vary from case to case, as courts have recognized:

> The purpose of such activity, the structure of the industry, and the strength of competition in the relevant geographic and product markets are among the factors that generally mold the outcome of such analysis. Of course, no single aspect is dispositive. Also, conclusions reached by courts in one context are not necessarily applicable in another.

*Harold Friedman, Inc. v. Thorofare Markets, Inc.*, 587 F.2d 127, 143 (3rd Cir.1978). *See also American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1241 (3rd Cir.1975); *Evans v. S.S. Kresge Co.*, 394 F.Supp. 817, 828 (W.D.Pa.1975), *cert. denied*, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977). An evaluation of the

claims in this case requires consideration of all the relevant circumstances including the nature of the service and product involved and the demands of the marketplace.

LAT–WP's service provides copyrighted news articles to subscribing newspapers. The articles may be considered "perishable goods" in that their value to a newspaper and to the ultimate consumer, the reader, depends upon timely publication while the subject matter remains newsworthy. Unlike the recurring needs for food and clothing which lead the consumer to continue purchasing the same brands and products, the specific news product fulfills a one-time need. Demand for that particular article is satisfied upon publication. While the subject may remain a matter of interest for the public and the news media, the article's value is depleted once it is published. The grant of territorially exclusive use assures a newspaper that it will receive the benefit of the subscription it paid for. The subscribing paper can be certain that any news service article it publishes will appear for the first time in the area on its pages.

Limited grants of exclusivity generally accompany the license to publish syndicated features of news articles, show movies, and broadcast certain radio and television programs, precisely because the factors of timeliness and limited demand shape the value of these services for the product distributors. The 1984 Olympic Games were broadcast in the United States solely by the American Broadcasting Company, not by all three national networks. Mike Royko's syndicated column appears in the *Philadelphia Daily News*, not in both the *News* and the *Inquirer*. *Peanuts* appears in the *Chicago Tribune*, not in both the *Tribune* and the *Chicago Sun-Times*. The ability to present a unique product in the newspaper or broadcast media contributes to the value of a paper or television station and enhances its competitive edge in the market place. Limited exclusivity grants are thus the custom of these industries. Subscribers pay not only for the right, but also for the exclusivity of such right.

The exclusive subscription to LAT–WP is important to the *Inquirer*, just as satisfying the *Inquirer*'s desire for exclusive rights is important to LAT–WP. One aspect of the *Inquirer*'s competitive draw would be lessened if another newspaper in the area published the same articles on the same day, or even worse, published the articles before the *Inquirer* chose to use them. The news service subscription would become less valuable to subscribing newspapers without the exclusivity provisions, which would in turn affect the value of LAT–WP as a business. The *Times* has noted that the *Inquirer* publishes only 10% of the articles provided by LAT–WP. This figure, however, represents the average use made of the service by all subscribers. On one hand, it may be argued that since one paper uses only 10% of the articles furnished by the news service, there is little chance for duplication of the same articles in rival newspapers. On the other hand, if the articles are chosen because of their particular interest to the readership, it is more likely that two papers catering to the same regional population would tend to choose many of the same articles. Furthermore, the *Inquirer* has stated that while it publishes an average of eight news service articles per day, many of these articles are used in Sunday editions, where there is a larger "news hole" than in weekday editions. The Sunday edition is the *Inquirer*'s most widely read issue in Gloucester County and the whole metropolitan area. If other newspapers could offer the same articles, the value of the service would certainly be diminished for the *Inquirer* and consequently for LAT–WP itself.

It is undisputed that the *Inquirer* requested a territorially exclusive subscription which LAT–WP granted. Plaintiff claims that when exclusivity is dictated by the purchaser of a product or service, as opposed to being granted by the supplier for its own purposes, the exclusivity is subject to closer scrutiny. *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 168 (3rd Cir.1979) (manufacturer terminated business with one customer at urging of

another customer allegedly because of price considerations); *Harold Friedman, Inc., supra*, 587 F.2d at 142 (alleged combination of shopping center and tenant supermarket to eliminate another tenant market from shopping center). These cases are distinguishable as dealing with tangible products or property leases, not copyrighted materials. When such products or leases are involved, territorial exclusivity is not generally the norm. However, newspapers, broadcasters, and film distributors almost always require exclusive use. In an industry where exclusivity grants are the custom, it is less significant that the purchaser, rather than the supplier, suggested the exclusivity provisions. Secondly, this court notes that this case is distinguishable from *Cernuto* and *Friedman* in that the *Inquirer* and LAT–WP had an exclusive arrangement long before the *Times* requested a LAT–WP subscription. Thus the *Times* was not deprived of any right it had previously enjoyed because of the *Inquirer*'s demands on the supplier. The *Times* was merely foreclosed from acquiring the publishing rights to LAT–WP articles, just as many publishers are foreclosed from bringing out certain books when the authors in question have assigned exclusive rights to other publishers.

While plaintiff has alleged that LAT–WP is "unique," the record demonstrates otherwise. First, the court notes that the exclusive subscription granted to the *Inquirer* is not a restraint on the flow of news. LAT–WP has given the *Inquirer* the exclusive rights in this area to publish certain news articles. Yet the *Times* is free to write its own articles on the same subjects or, as a less costly alternative, to contract with other supplemental news services which do exist, *e.g.*, the Baltimore Sun News Service, Copley News Service, Christian Science Monitor Service, Knight-News-Tribune News Wire, Newhouse News Service, New York Times News Service, and Scripps-Howard Newspaper Alliance. (Declaration of Thornton, ¶¶ 11–12). The record further shows that many suburban newspapers comparable to the *Times* subscribe to these services. (Declaration of Thornton, Appendix D).

Vertical trade restrictions have a variety of market effects, some of which are contradictory. "The market impact of vertical restrictions is complex because of their potential for a simultaneous reduction of intrabrand competition and stimulation of interbrand competition." *Continental T.V., Inc., supra*, 433 U.S. at 51–52, 97 S.Ct. at 2558. *See also, Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2nd Cir.1978), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1979). The *Inquirer*'s exclusive subscription to LAT–WP restricts intrabrand competition in the Philadelphia metropolitan area because the *Inquirer* is the only newspaper in the area which can publish LAT–WP articles. Yet at the same time, this exclusivity provision encourages interbrand competition in that other area newspapers interested in a supplemental news service are obliged to turn to services other than LAT–WP. In this way, a variety of topics and opinions are made available to residents of the metropolitan area through the newspaper media's use of a number of newswire services. Under the rule of reason, pro-competitive effects must be compared and balanced with anti-competitive effects. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). Furthermore "[t]he antitrust laws are 'designed for the protection of competition, not competitors.'" *Melso v. Texaco, Inc.*, 532 F.Supp. 1280, 1292 (E.D.Pa.1982), *aff'd*, 696 F.2d 983 (3rd Cir. 1982), *quoting Brown Shoes Co., Inc., supra*, 370 U.S. at 320, 82 S.Ct. at 1521. The court finds that properly limited exclusive subscriptions to news services further competition and consequently the public interest. In the end, such exclusive subscriptions result in each interested area newspaper contracting with a different service, thus guaranteeing that the reading public has access to a wider variety of news reporting and opinions. For these reasons, the *Inquirer*'s exclusive subscription in the eight-county metropolitan Philadelphia

512

area cannot be deemed excessively broad or injurious to competition.

## CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment is granted. In light of the court's decision to grant defendants' motion, plaintiff's cross-motion for summary judgment is denied. An appropriate order will be entered.