**ALLAPATTAH SERVICES, INC., et al., Plaintiffs,**

**v.**

**EXXON CORPORATION, Defendant.**

**No. 91–0986–Civ.**

United States District Court, S.D. Florida.

July 6, 1999.

Eugene Stearns, Miami, FL, Sidney Pertnoy, Gerald Bowen, McLean, Virginia, for plaintiffs.

Larry Stewart, Miami, FL, Robert Abrams, Robert Brookheiser, Stuart Harris, Darren B. Bernhard, Robert Wallis, Exxon Company, U.S.A., Houston, Texas, for defendant.

## ORDER DENYING EXXON'S RE-NEWED MOTION FOR SUMMARY JUDGMENT ON COUNT I

GOLD, District Judge.

THIS CAUSE is before the Court upon Exxon's Renewed Motion for Summary Judgment on Count I [D.E. # 1027]. Exxon's motion for summary judgment is predicated on two grounds: (1) Under applicable law and the undisputed facts in the record, there is no basis for Plaintiffs' claim that each class member's individual Sales Agreement gave rise to a "collective" contractual obligation to the "dealer class as a whole" to reduce wholesale prices by an amount that "on average, over time, across all markets," offset credit card processing fees charged to dealers over the twelve-year period of Exxon's Discount for Cash program; and (2) Even if such an obligation existed, the undisputed evidence establishes that Exxon did, in fact, comply with that alleged obligation, by having reduced its wholesale prices in an amount that offset credit card processing fees.

The record supports the conclusion that Exxon had a legal obligation to each dealer and that the legal obligation extended to the dealer class, as a whole. Because genuine issues of material fact exist regarding whether Exxon met or breached its legal obligation, Exxon is not entitled to summary judgment.

## I. Factual and Procedural Background

■ As a threshold matter, the Court is constrained to overturn a ruling by a predecessor judge, and may do so only under exceptional circumstances. *See, e.g., Stevenson v. Four Winds Travel, Inc.,* 462 F.2d 899, 904–05 (5th Cir.1972). To further the policy considerations underlying this restraint, the Local Rules for the Southern District of Florida require recon-sideration of a prior ruling only where the Court determines that there exists a "clear and obvious error," which in the "interests of justice" mandates correction. *See* S.D.Fla.L.R. 7.1(f); *American Home Assur. Co. v. Glenn Estess & Assoc., Inc.,* 763 F.2d 1237, 1239 (11th Cir.1985). Nevertheless, district courts "have the power and the duty" to delineate and narrow the issues to be tried. *See Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1333 (11th Cir.1998).

Judge Kehoe, who formerly presided over this action, entered an order denying Exxon's previous motion for summary judgment. Having found that Exxon's renewed motion raises no new issues, and having reviewed Judge Kehoe's order, the Court concurs with and adopts the ultimate conclusions of Judge Kehoe that: (1) the proper construction of the Sales Agreement did not permit Exxon to act arbitrarily in setting the wholesale prices it charged its dealers; (2) to determine the "agreement" assented to by the parties, the Sales Agreement must be read in conjunction with Exxon's Automotive Credit Card Guide and Agreement; (3) Exxon's duty to act in good faith precluded Exxon from double charging "on average" its dealers for credit card processing; and (4) parol evidence is admissible to establish Exxon's duty of good faith and the alleged breach of that duty.

However, because the duty of good faith is an express covenant in all contracts, and is implied in all contracts governed by the Uniform Commercial Code, the undersigned does not adopt Judge Kehoe's conclusion that, to the extent that a duty to impose duplicative charges on the dealers for the cost of credit card processing does not arise from the express language of the contract, such a term may be implied as a matter of law.[1] Consequently, to assist

---

1. Contracts for the sale of fuel products, including gasoline supply contracts, have been held to constitute transactions for the sale of "goods" within the meaning of Article 2 of the Uniform Commercial Code. *See* 67 Am. Jur.2d Sales § 53 (1985 & Supp.1992); *see also Etheridge Oil Co. v. Panciera,* 818 F.Supp. 480, 483 n. 1 (D.R.I.1993). As rep-resented by the parties, depending on the jurisdiction, courts construing contracts which include both goods, which are covered by Article 2 of the UCC, as well as services, which are not, apply either the "predominant factor" test or the "gravamen of the action" test. Under the former, the Court must decide whether the predominant purpose of the con-

the parties in ascertaining this Court's understanding of the relevant issues, the following sets forth supplemental findings of fact and rationales for denying summary judgment, as well as frames the ultimate issues to be tried to the jury regarding the duty and breach of duty elements to a cause of action predicated on a contractual relationship.

The essential facts relative to the good faith issue are not in dispute. Exxon sells gasoline, as well as other motor fuel products, to each of its direct-served dealers pursuant to supply contracts, which are typically in effect for a three-year period (the "Sales Agreement"). Each dealer's separate Sales Agreement with Exxon governs, among other things, the price each dealer must pay for its gasoline delivered by Exxon. The Sales Agreements contain an open price term, which permits Exxon to adjust prices, higher or lower, in response to the commercial dynamics in each of its various distribution markets.

Although the Sales Agreement did not expressly restrict the dealers' choice to purchase from suppliers other than Exxon, the record contains numerous references which illustrate that it would have been commercially impractical for the dealers to exercise their prerogative to purchase gasoline from alternate suppliers. These practical limitations on the dealers imped-ed their ability to avoid the economic effects of Exxon's pricing strategy.

Prior to adopting and implementing its Discount for Cash ("DFC") program, Exxon's wholesale price to its dealers included a cost for credit card processing. Pursuant to standard language in all of its form Sales Agreements, Exxon's dealers were required to purchase certain minimum monthly volumes of graded gasoline throughout the duration of the contract. Regardless of how it was stated over time, the price charged to the dealers was an "open price," which was intended to fluctuate based on a number of factors in effect when loading commenced or upon delivery.[2] In their respective form contracts, the dealers acknowledged receipt of the Seller's Automotive Credit Card Guide and Agreement (the "Credit Card Agreement"), and agreed to be bound by all of the terms and conditions thereof, as may be amended by Exxon from time to time.

Additionally, each Sales Agreement, both before and during the DFC program, included express language to the effect that any breach of a provision by either party of a failure to carry out the contract provisions "in good faith" was conclusively deemed to be substantial. The Sales Agreements also contained an integration clause stating that the writing was "intended by the parties to be the final, complete

---

tract is to supply goods or services. *See, e.g., Novamedix, Ltd. v. NDM Acquisition Corp.,* 166 F.3d 1177, 1182 (Fed.Cir.1999). For the latter test, the Court must focus on which aspect of the contract the dispute arises. Only if the dispute relates to the "goods" aspect of the contract does the UCC apply. *See, e.g., Delorise Brown, M.D., Inc. v. Allio,* 86 Ohio App.3d 359, 620 N.E.2d 1020 (1993). In the instant action, Plaintiffs do not dispute that they were obligated to pay the 3% credit card fee, which, Exxon has argued, is a service charge for the use of credit purchasing. Rather, the dispute arises over the wholesale price of the fuel delivered, which was to have been calculated at a price 3% less than they were formerly charged, to offset the "service charge" for credit card usage. Since the wholesale, or DTT, price relates to the "goods" portion of the contract, the UCC is applicable under either test. Moreover, Exx-on's practice of dealing in goods of the kind involved in the transactions at issue and having knowledge and skills peculiar to the relevant goods, conforms to the definition of a "merchant" under the UCC. *See* UCC § 2–104(1); *DeWeldon, Ltd. v. McKean,* 125 F.3d 24, 27 (1st Cir.1997) (the UCC attaches an expansive definition to the term "merchant").

**2.** Each form Sales Agreement over the twelve years of the DFC program contained essentially the same provisions, which included provisions that the dealer would pay Exxon at: (1) "Seller's established price at the time and place of delivery for the particular product(s) involved"; (2) "Seller's established dealer price appropriate for the transaction and in effect at the time loading commences"; and (3) "Seller's price in effect at the time of loading of the delivery vehicle."

and exclusive statement of their agreement about the matters covered" therein. The clause further disclaimed the existence of any oral understandings, representations or warranties affecting the written terms. By separate paragraph, the Sales Agreement purported to cancel and supersede any prior contract between the parties relative to the purchases and sales at the identified premises of any of Exxon's petroleum products covered by the contract.

In August of 1982, following a trend in the oil distribution industry, Exxon instituted its DFC program. The DFC program was designed as a competitive response to "private branders," which were selling unbranded gasoline on a "cash only" basis at prices below those charged by Exxon's dealers. Major petroleum companies, including Exxon, were experiencing lower demands while realizing increased operating costs, including the cost of maintaining a credit card system. These factors merged to reduce Exxon's earnings for petroleum products. Exxon sought to accomplish its goal of inducing its dealers to be more competitive and to increase their retail gasoline sales through its DFC program by: (1) reducing the wholesale price of gasoline and diesel fuel, which on average, would offset the charge for credit card usage to the dealer; (2) encouraging dealers to implement a tiered cash/credit retail pricing structure; and (3) charging its dealers a three percent (3%) fee on all credit card receipts submitted to Exxon for processing. Without dispute, Exxon's DFC program was facially similar, if not identical, to other such programs adopted and implemented by some of its competitors around the same time period.

Exxon tested the efficacy and potential acceptance of the DFC program by initially implementing the program in four pilot markets. Upon determining its success, Exxon set the environment for a national expansion of the program. At that time, Exxon announced the implementation of the program to its dealers and to the public at large.

Although Exxon's dealers were permitted to individually decide whether or not to offer a discount for cash to their respective customers, the charge on credit card assignments applied to all dealers and distributors. Similarly, the wholesale price reductions applied to all dealers and distributors. By letter dated August 24, 1982, Exxon unilaterally amended its Credit Card Agreement. All Exxon dealers were notified that, effective August 24, 1982: "All purchases by Exxon of accounts receivable evidenced by credit sale tickets will be discounted at a rate equal to 3% of the face value of the tickets."

Although not required to, most Exxon dealers participated in the DFC program. Nevertheless, the record clearly illustrates that dealers could not opt out of Exxon's offset pricing scheme. *See* Discount for Cash: Questions & Answers (Updated 1/20/84), at ¶ 7; April 30, 1990 Exxon Notice to Exxon Retailers. Without dispute, Exxon proceeded to collect the 3% credit card fee on receipt after August 1982.

Notwithstanding the clear implementation of Exxon's DFC program nationwide, the essence of Exxon's promises to its dealers and the legal effect of its commitment are hotly contested.[3] Exxon concedes that, at a minimum, it told its dealers that it would remove from the dealer transport truck ("DTT") price an amount that "on average" would offset the charge to dealers for credit card processing, resulting in a reduced DTT price for motor and diesel fuels.[4] Exxon's position in this

---

3. Plaintiffs contend that the record evidence establishes that Exxon used various labels to articulate its "commitment" to its dealers, such as: (a) to reduce the wholesale price of gasoline by 1.7 cents per gallon to offset separate credit card charges; (b) to "unbundle" or remove credit card charges from the wholesale price of its gasoline; (c) to charge a

"cash" as opposed to a "credit" dealer transport truck price; and (d) to reduce the wholesale price of gasoline by an amount sufficient to offset the 3% credit cost recovery fee.

4. The DTT price is merely another name for the wholesale price. The terms, as referred to in this Order, are interchangeable.

litigation, however, is that its statements about its proposed pricing modifications did not create a contractual obligation to individual dealers. Rather, it was a mere "marketing goal." Yet, Exxon also admits that it adhered to its representations throughout the twelve-year duration of its DFC program. Specifically, Exxon claims that an amount which "on average" offset the charge of credit card recovery fees was removed from the DTT price paid by its dealers.[5] In fact, in hearings before a Congressional Sub–Committee on December 2, 1982, Exxon testified that:

> we have implemented our Discount for Cash program on a nationwide basis to allow our dealers and distributors to be more competitive for this cash customer. **Under this program, we simultaneously instituted a 3 percent processing fee on credit card tickets submitted by dealers and jobbers and *cut our dealer and jobber buying price by an amount to offset, on average, the 3% fee.***

Statement of Exxon Company, U.S.A. Before the Energy, Environment & Safety Subcommittee of the Small Business Committee on Marketing Practices, at 2 (emphasis added).

In contrast, Plaintiffs have phrased the obligation differently. They contend that, in accordance with Exxon's own documents and pronouncements, Exxon was obligated to set wholesale motor fuel prices in a manner that, on average, over time, across all markets, would offset the separately imposed 3% credit cost recovery fee.[6] Plaintiffs further allege that Exxon not only failed to do as it promised, it also breached its obligation in bad faith, by secretly dividing its dealers into "keepers" and "non-keepers," while internally recognizing that its pricing practices were driving the "non-keepers" out of business. As Judge Kehoe noted:

> Thus, Plaintiffs contend the practice of double charging for credit cost recovery, once through a direct fee and again in the wholesale price, had the economic effect of advancing Exxon's strategy of closing down dealerships which did not meet its internal criteria. On this basis, Plaintiffs conclude, and the Court tends to agree, that a jury could accept Plaintiffs' view of the weight of the evidence.

Ultimately, what Exxon said, did, or failed to do, is a matter of fact to be resolved by the jury. However, the legal effect of Exxon's representations to its dealers is for the Court to determine.

## II. Discussion and Analysis

To substantiate its assertion that it cannot be held liable for breach of contract, Exxon directs the Court's attention to the integration clause contained in all of the Sales Agreements entered into with its dealers. Exxon contends that the integration clause precludes consideration of any terms or obligations not expressly within the four corners of the Sales Agreement. Consequently, Exxon argues that, since the Sales Agreement explicitly provides that it had the contractual authority to set the wholesale price for gasoline distributed to its dealers, Exxon properly used this authority to unilaterally set the wholesale price, and therefore, its pricing methodology cannot be a basis for establishing a breach of the Sales Agreements. Exxon further argues that it did not breach its good faith obligation in setting its wholesale prices, because the covenant of good faith imposes only an obligation to set a reasonable price. Because Exxon's wholesale prices were comparable to its competitors, it complied with the reason-

---

5. Exxon does not contend it had an obligation to offset credit card recovery fees only one time—at the beginning of the DFC program. Rather, its position is that it did so throughout the twelve-year period. Plaintiffs contend that Exxon only made three such adjustments during the twelve years of the DFC program.

6. The record reflects that Exxon communicated its promise to offset the 3% credit card processing charge by an "on average" amount deducted from the wholesale price of fuel to its dealers, and that it represented to the dealers that it was, in fact, providing the offset. *See, e.g.,* April 30, 1990 letter to Exxon Retailers.

ableness standards for fixing its open price term.[7]

Exxon's arguments are flawed, however, in several respects. First, the integration clause does not exonerate Exxon as a matter of law. Second, even though Exxon had the discretionary authority concerning its wholesale pricing, that authority is expressly limited by its contractual obligation of "good faith," and further, by the UCC's requirement that the price be set in good faith. Third, merely setting a price comparable to its competitors, does not preclude a finding that Exxon's prices were reasonable for purposes of substantiating its good faith obligation. Because determinations of these issues require factual analysis, which underlying facts are disputed among the parties, summary judgment is inappropriate.

### A. Determining the Final Expression of Contracting Parties

Exxon correctly points out that each Sales Agreement contained an integration clause which provided, with minor variations, that the Sales Agreement was "the final, complete and exclusive statement of [the parties'] agreement about the matters covered [t]herein," and that there were "no oral understandings, representations or warranties affecting [the agreement]." Exxon further correctly states that each Sales Agreement provided that modification could be accomplished "only by a writing signed by both of the parties or their duly authorized agents." However, case law applicable to interpreting the controlling effect of integration clauses and limiting modifications by subsequent oral agreement construe these as factual determinations, which cannot be decided as a matter of law.

### 1. *The Effect of Integration Clauses*

■ The UCC provides that, even though words and terms in a writing intended to be the final expression of the agreement of the parties may not be contradicted by evidence of a prior or contemporaneous agreement, extrinsic evidence may be used to explain or supplement the writing, in the form of course of dealing, trade usage, and "by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." UCC § 2–202. An integration clause which merely states that the parties intend the writing to be a complete and exclusive statement of the terms of the agreement does not suffice to negate the importance of trade usage and course of dealing, "because these are such an integral part of the contract that they are not normally disclaimed by general language in the merger clause." Hawkland, *Uniform Commercial Code Series* § 2–202:03 (1984). "Unless carefully negated [trade usage and course of dealing] have become an element of the meaning of the words used."[8] *Id.*

---

**7.** Exxon has raised additional arguments: (1) since the Sales Agreements contain an integration clause, the Court is precluded from using extrinsic evidence to establish a breach of the agreement; and (2) Exxon's contractual obligations differed among its dealers, and therefore, Plaintiffs cannot establish a "collective" obligation necessary to proceed as a class action. As·to the use of extrinsic evidence, the Court has determined that the UCC, which governs the Sales Agreement, condones the liberal use of parol evidence to explain and supplement the express terms of contractual provisions. This issue is further articulated in the Court's Order on Exxon's Motion to Exclude Extrinsic Evidence to Establish the Alleged Obligation Under the Written Contracts. With regard to Exxon's second additional argument, which has been addressed in several prior orders, Exxon's own documentation substantiates that, although the actual amount of the reduction might have varied from dealer to dealer, Exxon owed the same duty to all dealers: The duty to set the wholesale price in good faith, which incorporates the duty not to charge its dealers twice for the cost of credit card processing.

**8.** "[I]t should be noted that the limiting effect of the integration clause ... is reserved for situations covered by section 2–202(b), namely those in which evidence other than trade usage, course of dealing, or course of performance is proffered to explain or supplement the terms of an integrated writing." Hawkland, *Uniform Commercial Code Series* § 2–202:03 (1984).

Although merger or integration clauses have been considered strong evidence of finality, they are not conclusive on the issue of whether the writing encompasses the entire agreement of the parties. *See, e.g., Sierra Diesel Injection Service, Inc. v. Burroughs Corp., Inc.*, 890 F.2d 108, 112 (9th Cir.1989). In fact, the UCC's definition of "agreement" necessarily contemplates that the parties' obligations transcend the written words within the signed document: " '·Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance." UCC § 1–201.

 Thus, to determine whether the writing constitutes the final expression of the parties as to their obligations under a valid contract, multiple factors should be considered. *See, e.g., Nanakuli Paving & Rock Co. v. Shell Oil Co., Inc.*, 664 F.2d 772, 796–97 (9th Cir.1981). These factors include evidence of trade usage, course of dealing, and course of performance. *See id.* at 794; *Transamerica Oil Corp. v. Lynes, Inc.*, 723 F.2d 758, 765 (10th Cir. 1983). Trade usage is "relevant to show that the expectation of the parties that a given usage would be observed was justified." *Nanakuli Paving & Rock Co.*, 664 F.2d at 785. Both parties need not be consciously aware of the particular trade usage at issue. "It is enough if the trade usage is such as to 'justify an expectation' of its observance." *Id.* at 792 n. 28 (quoting White & Summers, *Uniform Commercial Code* § 3–3, at 84 (1972)). "[P]arties

to a contract such as the one in issue are presumed to have intended the incorporation of trade usage in striking their bargain." *Nanakuli*, 664 F.2d at 798 n. 40. Since the UCC provides that the scope and existence of a trade usage must be established by factual proof, the extent to which trade usage affects the written expressions of contracting parties is a jury question. *See id.* at 792.

Course of dealing, like trade usage, gives meaning to and supplements or qualifies the terms of a written agreement. However, since course of dealing actually controls usage of trade, course of dealing is a more important factor for consideration. *See id.* at 795.[9] According to the Official Comment,[10] course of dealing is determined by considering the language of the agreement, the actions of the parties, commercial standards, "and other surrounding circumstances." Thus, the proper construction of contracts governed by the UCC requires familiarity with the commercial context in which the agreement was formed. *See id.; see also* 2 Anderson, *Uniform Commercial Code* § 2–202:13 (3d ed.1982). Whether a course of dealing exists between parties to a transaction is a question of fact. *See Gord Industrial Plastics, Inc. v. Aubrey Mfg., Inc.*, 103 Ill.App.3d 380, 59 Ill.Dec. 160, 431 N.E.2d 445, 449 (1982).

Of the factors to be considered for determining the finality of a writing as enumerated in the UCC, actual performance provides the greatest weight to the parties' intentions and expectations.[11] *See Nanakuli Paving & Rock Co.*, 664 F.2d at 795.

---

9. The UCC defines "course of dealing" as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." UCC § 1–205. "Usage of trade" refers to "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question."

10. Although not binding law, courts give deference to the UCC's Official Comments, and may use the commentary as persuasive guid-

ance to assist in construing and applying the Code. *See, e.g., Appeal of Copeland*, 531 F.2d 1195 (3d Cir.1976).

11. Exxon has argued that no affirmative representations were made to several of the dealers in the Plaintiff-class. Therefore, according to Exxon, those dealers' expectations are not justifiable and cannot be considered. Nevertheless, even if this contention is correct, there is substantial evidence in the record, considered on summary judgment, that creates a genuine and material factual dispute regarding this issue. For instance, Exxon testified that, National Dealer Advisory Council meetings, the dealers repeatedly ques-

The rationale for placing such importance on course of performance is obvious: "The parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what that meaning was." *Id.* (quoting source omitted).[12]

The majority of courts have utilized these factors in determining whether a writing was intended to be the final and exclusive expression of the parties' contractual obligations. *See id.* at 798–805 (citing several cases including *Chase Manhattan Bank v. First Marion Bank*, 437 F.2d 1040, 1048 (5th Cir.1971) ("the use of such evidence 'simply places the court in the position of the parties when they made the contract, and enables it to appreciate the force of the words they used in reducing it to writing.'")). The UCC does not presume that a written contract sets forth the parties' entire agreement. *See Betaco, Inc. v. Cessna Aircraft Co.*, 32 F.3d 1126, 1132 (7th Cir.1994). Instead, in addition to these factors, the UCC focuses on the intention of the parties to determine the efficacy of an integration clause. *See Sierra Diesel Injection Service*, 890 F.2d at 112.

### 2. The Effect of the No–Modification Clause

As with the integration clause, the UCC does not rigidly enforce clauses which preclude modification in the absence of a writing assented to by both parties.[13] Courts have likewise been reluctant to adhere to strict interpretations of an agreement's express terms "when doing so would not serve the underlying purpose of the terms." *Radiation Systems, Inc. v. Amplicon, Inc.*, 882 F.Supp. 1101, 1103 (D.D.C.1995) (citations omitted).

Parties to a contract with an express term disclaiming the efficacy of a modification unless in writing can waive such an express term through their subsequent performance. *See id.* at 1105.

tioned whether Exxon was offsetting the 3% fee from the wholesale fuel price. Repeatedly, Exxon represented that it was. *See* Deposition of Morton Voller, at 304–05. Whether the regional dealer representatives disseminated this information in a manner that all dealers became aware of Exxon's obligation, and its affirmance of it, is a question to be determined based on factual proof. Thus, these facts, when developed at trial, will resolve the dispute over individual dealer's expectations.

12. Unlike trade usage and course of dealing, which involve implied agreements that are made prior to, or contemporaneous with, the writing, course of performance occurs after the writing is executed, and there, a writing may be contradicted by course of performance. *See* Hawkland, *supra.* "As a result evidence as to the existence and meaning of terms supplied by course of performance should never be excluded." *Id.*

13. Contrary to Exxon's position, contracts controlled by the UCC do not require a modification to be supported by consideration. *See* UCC § 2–209(1). Under the UCC, "[a]ny contract, however made or evidenced, can be discharged or modified by subsequent agreement of the parties." *Pepsi–Cola Co. v. Steak 'N Shake, Inc.*, 981 F.Supp. 1149, 1153–54 (S.D.Ind.1997) (quoting 3 Corbin *Corbin on Contracts* § 574, at 371 (1960)); *see also Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 145 (6th Cir.1983) (citations omitted). The Code does, however, impose a duty of good faith on all efforts to modify a contract. *See* UCC § 1–203(3); *T & S Brass & Bronze Works, Inc. v. Pic–Air, Inc.*, 790 F.2d 1098, 1105 (4th Cir.1986). Nevertheless, Exxon's obligation did not lack for consideration. All dealers suffered a detriment by having incurred a unilaterally imposed new 3% credit card fee. Exxon obtained a benefit through the anticipation of increased gasoline sales by its dealers as a result of the DFC program. The consideration on the part of the dealers was to continue to sell Exxon's gasoline products and to pay the 3% credit card processing fee in exchange for the offset in the wholesale price. *See, e.g., Roth Steel Prods.*, 705 F.2d at 144–45. Exxon itself notes that the 3% processing fee was necessary in order to encourage its dealers to participate in the DFC program, because retailers had no incentive to discount for cash unless it was cost effective for them to do so. When Exxon unilaterally changed its good faith obligation of performance to encourage participation in the DFC program nationwide, and unilaterally amended the Credit Card Agreement, no additional reciprocal obligation was required from the dealers to cause Exxon to adhere to its good faith duty. *See T & S Brass & Bronze Works, Inc.*, 790 F.2d at 1105.

Thus, while a written agreement may provide that it cannot be modified except by a writing signed by both parties, as the term exists in the Sales Agreements at issue, "the agreement can be changed by a course of actual performance." *All–Year Golf, Inc. v. Products Investors Corp.,* 34 A.D.2d 246, 310 N.Y.S.2d 881, 885 (1970); *see also Nanakuli,* 664 F.2d at 795 ("Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the contract."); note 10, *supra.* Modifications can also be effectuated "by subsequent oral agreement or course of dealing with one another despite the requirement of a writing in order to modify." *Linear Corp. v. Standard Hardware Co.,* 423 So.2d 966, 968 (Fla. 1st DCA 1982) (citations omitted). Modifications to contracts under the UCC, however, must meet the test of good faith. *See* UCC § 2–209, cmt. 2. "The effective use of bad faith to escape performance on the original contract terms is barred, and the extortion of a 'modification' without legitimate commercial reason is ineffective as a violation of the duty of good faith . . . ." *Id.*

### 3. *Propriety of Summary Judgment on the Integration and Modification Issues*

■ Applying the relevant law to the instant action, the Court must consider several factors to determine whether the Sales Agreement is a writing expressing the final agreement of the parties as to all of their respective obligations. Situations implicating integration and modification clauses raise factual issues important to determining the justifiable expectations of the parties. Insofar as these determinations are dependent on Exxon's intentions in setting its wholesale prices, which frequently fluctuated, factual questions exist which preclude summary judgment. *See Betaco, Inc.,* 32 F.3d at 1131 (citations omitted). "When a court interpreting a contract goes beyond the four corners of the contract and considers extrinsic evidence, the court's determination of the parties' intent is a finding of fact." *See id.* (quoting *In re Pearson Bros. Co.,* 787 F.2d 1157, 1161 (7th Cir.1986)).

Exxon admits that, for at least a period of time, it did offset the wholesale prices to its dealers by an amount equal to the 3% credit card recovery fee.[14] It has been further admitted that, in 1991, Exxon began showing a 1.5 cent per gallon line item credit fee discount on its dealer invoices. Since Exxon's actions after the implementation of its DFC program suggest that it waived the prohibition against unwritten modifications contained in the Sales Agreement, "modification of the agreement's express terms becomes a triable issue of fact, not a matter for summary judgment." *Radiation Systems, Inc.,* 882 F.Supp. at 1103.

■ Moreover, any misrepresentations among the contracting parties "undermines the intentional adoption of an integrated writing." *Latham & Assocs., Inc. v. William Raveis Real Estate, Inc.,* 218 Conn. 297, 589 A.2d 337, 343 (1991). Thus, parties cannot avoid the consequences of a breach of the implied covenant of good faith merely by including an integration clause in their agreement. *See Amoco Oil Co. v. Ervin,* 908 P.2d 493, 499 (Colo.1995)

---

**14.** Exxon also makes admissions that it adhered to the offset pricing scheme throughout the entire twelve year duration of its DFC program. In papers filed in this action, admissions were made that: "On the first day of the program, Exxon reduced its wholesale gasoline prices by 1.7 cents per gallon in each of its markets . . . . Exxon continued to adjust its prices in this manner until the DFC program was discontinued in August 1994."

Exxon's Fuel Pricing Coordinator also testified that every time the issue was raised by the dealers, they were told that Exxon was offsetting the credit cost recovery fee. Record evidence indicates that similar adjustments were made in 1986, 1990, and 1992. In so acting, Exxon has interjected a genuine issue of fact as to a modification through a course of performance.

("The merger and integration clauses do not permit Amoco to breach the implied covenant of good faith and fair dealing by duplicate charging.").

In sum, the duty of good faith must be present throughout the entire formation and performance of the contract. *See* UCC § 2–209. Whether Exxon modified the Sales Agreement or whether the Sales Agreement constituted a final expression of the parties' intentions and justifiable expectations are disputed issues for the jury to decide. *See Allied Chemical Corp. v. DeHaven*, 752 S.W.2d 155, 159 (Tex.App. 1988). Resolution of these issues will necessarily depend upon whether Exxon performed its obligations under the Sales Agreements in good faith, which is also very much in dispute.[15]

### B. Establishing the Legal Duty of Good Faith

Exxon points out that it had four different open price terms in effect during the course of its DFC program, and that none of those terms refers to: (1) the DFC program; (2) any price reduction, deduction or offset in the price of gasoline; and (3) any formula or method for establishing Exxon's wholesale prices to its dealers. Exxon correctly avers that the 3% fee amendment to its Credit Card Agreement did not refer to the DFC program or any reduction or offset to its wholesale prices. Nevertheless, Exxon's averments do not, as a matter of law, reconcile its alleged conduct with the considerations applicable under the UCC for determining whether contractual obligations have been performed in good faith.[16]

### 1. The UCC's Obligation of Good Faith

Under the UCC, every contract or duty within the Sales Act imposes an obligation of good faith in its performance and enforcement. *See* UCC § 1–203.[17] The UCC defines good faith as it relates to sales transactions as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." UCC § 2–103(1)(b).[18] The Official Com-

---

**15.** Exxon also argues that the Sales Agreement included a paragraph that a subsequent three-year contract entered into by the parties would cancel and supersede all prior contracts between the parties for the transactions covered therein. *See* Sales Agreement, at ¶ 27. However, a superseding contract does not always rescind prior contractual obligations. *See, e.g., Latham & Assocs., Inc.*, 589 A.2d at 341–42. In fact, the Sales Agreement states that: "Termination of this contract by either party for any reason shall not relieve the parties of any obligation theretofore accrued under this contract." Sales Agreement, at ¶ 21(g). Thus, another jury issue has been raised as to the survivability of Plaintiffs' cause of action upon execution of a subsequent Sales Agreement, and whether the parties intended for subsequent agreements to discharge the obligations previously assumed by the parties in the prior, expired Sales Agreement, which intentions, again, will need to be viewed in light of the duty to contract in good faith. *See also* UCC § 2–106(3) ("On 'termination' all obligations which are still executory on both sides are discharged *but any right based on prior breach or performance survives.*") (emphasis added).

**16.** Every state in the union, except Louisiana, has adopted, by statute, almost verbatim ver-

sions of the UCC. *See Pennzoil Co. v. Federal Energy Regulatory Comm'n*, 789 F.2d 1128, 1142 (5th Cir.1986) (since "all states except Louisiana have adopted the UCC, variations between state law and general principles are likely to be few"). In 1975, Louisiana incorporated part of the UCC into its revised statutes. *See Brill v. Catfish Shaks of America, Inc.*, 727 F.Supp. 1035, 1041 & n. 10 (E.D.La. 1989). However, regarding the definition of "good faith," Louisiana adopted only the subjective—"honesty in fact"—not the objective—"commercial reasonableness"—standard for determining good faith. *See id.* at 1041. "There is no provision in Louisiana law to support application of an objective standard of good faith." *Id.*

**17.** The UCC's obligation to contract in good faith simply states that: "Every Contract or duty within this Act imposes an obligation of good faith in its performance and enforcement." UCC § 1–203.

**18.** UCC Section 1–203, Official Comment Note provides that "... under the Sales Article definition of good faith (Section 2–103), contracts made by a merchant have incorporated in them the explicit standard not only of honesty in fact (Section 1–201), but also of observance by the merchant of reasonable

ments to this section state that good faith is "a basic principal running throughout this Act," and that the concept is broad and general in its application, and "is further implemented by Section 1–205 on course of dealing and usage of trade." Thus, because there is no exact formula to apply, courts have looked at the ambiguities inherent in the UCC's definition to define the concept within the context of the agreement.[19] The Comment disclaims any provision of an additional cause of action for failure to act in good faith. *See also Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 617 (3d Cir.1995) (good faith is an interpretive tool to determine the parties' justified expectations, and is not to be used for enforcement of "an independent duty divorced from the specific clauses of the contract"). Rather, the doctrine merely directs courts toward "interpreting contracts within the commercial context in which they are created, performed, and enforced." UCC § 1–203, Official Comment.

▮▮▮▮ The policy considerations underlying the good faith doctrine are generally "to effectuate the intentions of the parties or to honor their reasonable expectations." *Amoco Oil Co.*, 908 P.2d at 497. Satisfaction of these considerations requires performance of contractual obligations faithfully as to "an agreed common purpose and consisten[t] with the justified expectations of the other party." *Id.* Bad faith occurs when a party acts to exploit changing economic conditions to secure gains that exceed those reasonably expected at the time of contracting. *See, e.g., Orange & Rockland Utils., Inc. v. Amerada Hess Corp.*, 59 A.D.2d 110, 397 N.Y.S.2d 814, 818 (1977). The implied duty of good faith and fair dealing is most commonly raised as an issue in output and requirements contracts, wherein the price and quantity terms are left open. *See,*

*e.g., Ervin v. Amoco Oil Co.*, 885 P.2d 246, 250 (Colo.App.1994).

▮▮▮ The duty of good faith is especially applicable in situations when the contract confers one party with the discretion to determine certain terms of a contract, such as an open price term agreed to be unilaterally set. *See id.* (citing *Hubbard Chevrolet Co. v. General Motors Corp.*, 873 F.2d 873, 876 (5th Cir.1989). The duty acts to preserve and to control opportunistic behavior, by requiring that the price be "reasonable and set pursuant to reasonable commercial standards of fair dealing in the trade." *TCP Industries, Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 548 (6th Cir. 1981). Consequently, although it may be agreed that one party has the discretionary authority to set an open price term, this discretion is circumscribed by the duty placed on the discretion-exercising party to set the price in good faith. *See id.*

▮▮▮▮ Case law interpreting this implied covenant under UCC § 1–203, support this obligation to act in good faith when determining terms to be implied in a contract where the terms are not expressly provided therein. *See L.C. Williams Oil Co. v. Exxon Corp.*, 625 F.Supp. 477, 481 (M.D.N.C.1985); *see also United Air Lines, Inc. v. ALG, Inc.*, 912 F.Supp. 353 (N.D.Ill.1995) (the duty requires that parties act in good faith when exercising discretion afforded by the contractual relationship and to act in a manner consistent with the reasonable expectations of the parties); *Garrett v. BankWest, Inc.*, 459 N.W.2d 833 (S.D.1990) (breach of contract claim for breach of the covenant of good faith is permitted even though the conduct failed to violate the express terms of the contract); *Einhorn v. Ceran Corp.*, 177 N.J.Super. 442, 426 A.2d 1076 (1980) (where fairness and justice require, courts may impose a duty required to effectuate

commercial standards of fair dealing in the trade."

**19.** "Part of the strength of such general concepts as 'good faith' and 'commercial reason-

ableness' lies in an elasticity and lack of precision that permits them to be, in the language of the Code's own comment, 'developed by the courts in light of unforseen and new circumstances and practices.'" Farnsworth,

the implicit covenant of good faith and fair dealing necessarily involved in the parties' contractual relations); *Nora Springs Co-op. Co. v. Brandau,* 247 N.W.2d 744 (Iowa 1976) ("good faith" refers to honesty in fact in the conduct or transaction concerned). Moreover, it appears that the duty to act in good faith is directly correlative to the amount of discretionary authority delegated by the contract. *See Melso v. Texaco, Inc.,* 532 F.Supp. 1280, 1297 (E.D.Pa.1982).[20]

### 2. *Exxon's Compliance With Its Good Faith Obligations*

■ In the instant case, every Sales Agreement in effect or entered into by Exxon and its dealers between August 1982 and August 1994 contained an open price term, imposing a concurrent express duty to carry out the provisions of each Sales Agreement in good faith. Accordingly, under § 2–305 of the UCC,[21] as well as under the express terms of its Sales Agreement, Exxon was required to fix the price charged to each of its dealers in good

faith.[22] Similarly, the UCC's § 2–311 provides that where the particulars of performance are specified by one of the parties, "[a]ny such specification must be made in good faith and within limits set by commercial reasonableness." UCC § 2.311(1).[23] Thus, Exxon had a duty to each dealer to set its open price term in good faith and within the limits set by commercial reasonableness. This duty was part of each Sales Agreement and was independent of any subsequent amendment or modification..

■ Moreover, "in the 'normal case,' a 'posted price' or a future seller's or buyer's 'given price,' 'price in effect,' 'market price,' or the like, satisfies the good faith requirement." UCC § 2–305, cmt. 3. "However, the words 'in the normal case' mean that, although a posted price will usually be satisfactory, it will not be so under all circumstances." *Nanakuli Paving & Rock Co.,* 664 F.2d at 805.

Exxon contends that its "price in effect" is, by definition, a price set in good faith. To support its contention, Exxon asserts

*Good Faith Performance,* 30 Univ.Chi.L.Rev. 666, 676 (1963).

20. For instance, when the dispute involves a contract of adhesion, the court must review its terms for fairness. *See Melso v. Texaco, Inc.,* 532 F.Supp. 1280, 1297 (E.D.Pa.1982) (citing *Corbin on Contracts* ). A contract of adhesion is one in which the terms are not negotiable, requiring one party to "take-it-or-leave-it." *See id.* For a contract of adhesion to be fair, it "must not give one party all the benefits while giving the other party all of the burdens of the contract." *Id.* at 1298 (citing *Corbin on Contracts* ). Moreover, it is a basic tenet of contract law, especially in the context of adhesion contracts, that ambiguities be interpreted against the party that drafted the contract. Plaintiffs have, on occasion, inferred that Exxon's Sales Agreement constitutes a contract of adhesion. The Court does not reach this determination. The analogy of the subject Sales Agreements to the legal theories applicable to adhesion contracts is merely illustrative of the incremental scrutiny in which courts are instructed to engage when addressing issues predicated on contracts conferring discretion-exercising authority on one party to ensure that that party does not overreach its discretionary authority.

21. Section 2–305 of the UCC establishes the standard for setting an open price term. The section explicitly states that: "A price to be fixed by the seller or by the buyer means a price for him to fix in good faith."

22. There is no issue of law or fact as to whether Exxon owed a duty of good faith to each of its dealers. Exxon agrees that it owed such a duty both pursuant to the express terms of its Sales Agreement and under the UCC. The dispute, however, concerns what this duty means and how it applies under the circumstances.

23. The commentary to this section provides that:

The party to whom the agreement gives power to specify the missing details is required to exercise good faith and to act in accordance with commercial standards so that there is no surprise and the range of permissible variation is limited by what is commercially reasonable. The "agreement" which permits one party so to specify may be found as well in a course of dealing, usage of trade, or implication from circumstances as in explicit language used by the parties.

UCC § 2–311, cmt. 1.

that "courts have uniformly rejected claims that open price terms in gasoline supply contracts require specific pricing obligations based on oral statements, written representations or marketing programs." However, based on the reasons given by the courts in Exxon's cited cases, which addressed issues surrounding similar DFC programs, the Court finds that the facts and allegations in the instant case are distinguishable.

For instance, in *Wayman*, service station franchisees sued their franchisor for breach of contract for failing to set its dealer buying price for gasoline in good faith and in a commercially reasonable manner as required by the UCC. *See Wayman v. Amoco Oil Co.*, 923 F.Supp. 1322 (D.Kan.1996). The franchisees had signed contracts with Amoco providing that they would purchase their gasoline from Amoco at its "dealer buying price." *See id.* at 1332. The franchisees alleged, however, that this price was higher than the price at which independent marketers could purchase their fuel, placing Amoco franchisees at a competitive disadvantage. *See id.* at 1334. The court found that, according to the commentary, UCC § 2–305 was designed "to prevent discriminatory pricing—i.e., to prevent suppliers from charging two buyers with identical pricing provisions in their respective contracts different prices for arbitrary or discriminatory reasons." *Id.* at 1347. Because all Amoco franchisees paid the same dealer buying price, there was no discriminatory pricing and, therefore, no UCC violation. *See id.* Significantly, the district court made a specific finding that the basis of the plaintiffs' claims was that the fuel supplier charged a wholesale price higher than the dealers thought reasonable. *See id.* at 1338.

Another example offered by Exxon is based on an Illinois appellate decision that reached the same conclusion when interpreting the plaintiffs' claim of over charging. *See Abbott v. Amoco Oil Co.*, 249 Ill.App.3d 774, 189 Ill.Dec. 88, 619 N.E.2d 789, 794 (1993). In *Abbott*, the dealers claimed that Amoco had agreed to discount its wholesale prices to offset credit card processing fees Amoco began charging for credit purchases. *See id.* at 780, 189 Ill. Dec. 88, 619 N.E.2d 789. However, the dealers felt that Amoco's discounts were not "realistic" and "meaningful." *Id.* In effect, "the dealers thought that Amoco's gas was still priced too high, *even after the application of the discount.*" *Id.* (emphasis added). Thus, the court determined that the gravamen of the dealers' complaints was that "Amoco charged too much for its gasoline." *Id.* According to the court, "allegations of an unexpectedly high price, *without more*, do not state a claim for breach of the implied covenant of good faith and fair dealing in light of the contractual terms at issue in this case." *Id.* at 783, 189 Ill.Dec. 88, 619 N.E.2d 789.

In *Remus*, a dealer alleged that Amoco violated a state statute by adopting a DFC that applied to all dealers. *See Remus v. Amoco Oil Co.*, 794 F.2d 1238, 1239 (7th Cir.1986). Because most of the dealer's sales were for credit, the dealer complained that Amoco's unilateral action constituted a substantial change in the competitive circumstances of his dealership agreement. *See id.* at 1239–40. The court found that, since the DFC policy was system-wide, Amoco was not discriminating. More importantly, the court actually determined that Amoco had "unbundled" the cost of credit card processing from the wholesale price of gasoline. *See id.* at 1241. Thus, these courts reached the conclusion that the plaintiffs had not established bad faith on the part of the oil suppliers.

In contrast, and more on point, is *Amoco Oil Co. v. Ervin*, 908 P.2d 493 (Colo.1995), in which the Colorado Supreme Court determined that, "by duplicate charging, Amoco did not perform the contracts in accordance with the dealers' reasonable expectations." *Id.* at 499. Accordingly, the court upheld the jury verdict which found that Amoco had breached the covenant of good faith and fair dealing. *See id.*

Significantly, two of the cases relied upon by Exxon discuss the situation whereby there is a presumption of bad faith when a merchant acts in a manner intended to drive a franchisee out of business. In *Remus,* the Seventh Circuit, in addition to finding that Amoco had "unbundled" as promised and implemented its DFC to affect all dealers, the court determined that "[t]here [was not] a shred of evidence that Amoco has ever wanted to drive Remus out of business." *Remus,* 794 F.2d at 1240–41. Similarly, in *Wayman,* the district court stressed that in the absence of allegations of double-charging and excessive pricing designed to drive dealers out of business, the dealers failed to raise a triable issue of a breach of good faith. *See Wayman,* 923 F.Supp. at 1347, 1352–53 & n. 23. Both of these allegations—double charging and intent to drive dealers out of business—have been raised in the instant case. Moreover, Plaintiffs have adduced enough evidence to raise a triable jury issue on these allegations.

As to Exxon's price-setting practices prior to implementing its DFC program, the Court concurs with Exxon's representation. Plaintiffs do not claim that Exxon's wholesale prices were discriminatory or outside the range of prices charged by other major oil companies. Rather, Plaintiffs argue, and Judge Kehoe determined, that this case deserves special treatment because it is not a "normal case" as contemplated by § 2–305. As concluded by Judge Kehoe:

> It would not be the normal case for Exxon to double charge for credit cost recovery through its price to people

lacking the means to know it was happening, or to tell its dealers for twelve years who lacked the means to know otherwise that its price was net of credit costs when it was not, or to use its pricing discretion to eliminate dealers as alleged here.

Because the parties' dispute is not over the actual amount of the price Exxon charged for its wholesale gasoline to its dealers, but rather over the manner in which the wholesale price was calculated without considering the doubled charge for credit card processing, the instant action is not the "normal" case. *See id.* Accordingly, I concur with Judge Kehoe's conclusion, albeit with some supplementation.

Pursuant to the UCC, as a merchant, Exxon's duty of good faith to its dealers meant factual honesty *and* the observance of reasonable commercial standards of fair dealing in the trade. UCC § 2–103(b). Thus, good faith consists of two separate components, both of which must be satisfied.[24]

### a. *Honesty in Fact*

As to the first element, the record evidence shows that Exxon adopted and implemented a nationwide standard of performance to fix its open wholesale prices in a manner that would not "double charge" the dealers "on average" for credit card processing fees. By virtue of the express terms of their individual contracts, Exxon's good faith performance obligation extended to each dealer. This same good faith obligation was extended collectively, as well, to all its dealers nationwide, because Exxon's wholesale price reduction was for

---

**24.** An oft cited treatise on the UCC explains that:

> The Code employs two standards of good faith. Section 1–201(19) states the generally applicable "subjective" ("white heart and empty head") standard which concentrates on the actual state of mind of the party rather than on the state of mind a reasonable man would have had under the same circumstances. Thus, the section defines good faith as "honest in fact in the conduct or transaction concerned." In the case of merchants, however, or at least those mer-

chants governed by Article 2 on Sales, an objective element is added to their good faith duties. Section 2–103(1)(b) provides that " '[g]ood faith' in the case of a merchant means honest in fact and the observance of reasonable commercial standards of fair dealing in the trade." This definition imposes a duty on merchants to meet good faith requirements that are measured both subjectively and objectively.

2 Anderson, *Uniform Commercial Code* § 1–203:1.

an amount, which "on average," would offset the charge for credit.

In the Court's view, Exxon misstates the nature of Plaintiffs' claim. Plaintiffs have adduced evidence from Exxon's own documents, which indicates that dealers did not have a choice on whether or not they wished to participate in the offset arrangement. Although they could decline to offer their customers discounts for using cash, the charge on credit card assignments was to apply to all dealers, "regardless of their decisions on whether to offer cash discounts. **Similarly, the product price reductions applied to all dealers and distributors.**" Exhibit N to Respondents' Appendix in Support of Response to Petition for Writ of Mandamus. Thus, it is clear that the dealers, at least those whose contracts were in effect as of August 24, 1982, had no choice in Exxon's decision to implement its wholesale/credit offset plan.

Consequently, while each class member asserts his or her individual claim based on their respective Sales Agreement with Exxon, Exxon owed the same duty of good faith performance to each and every dealer, and thereby, to the collective class as a whole. Specifically, Exxon's good faith performance obligation was to offset **on average among all its dealers from which the collective class of dealers nationwide would benefit.** By adopting and implementing its program, a duty arose to carry it out "honestly in fact" in favor of each dealer, and all dealers nationally, to accomplish the "on average" reduction.[25]

As Judge Kehoe concluded, if Exxon did, in fact, double charge in its pricing decisions, it would not have acted "honestly in fact" in regard to its transactions with its dealers. How each dealer was to benefit "on average" is a matter of fact and proof. The mere fact that the benefit was "on average," does not excuse Exxon from its good faith performance obligation

to each dealer to act according to the representations made to all its dealers.

### b. *Commercial Reasonableness*

The second component of the good faith analysis focuses on the objective "commercial reasonableness" of fixing the open price term. Commercial reasonableness acts as a guide for courts to determine whether a party acted in good faith. Because there is no precise definition of the term "commercial reasonableness," the facts of the case will be determinative of whether conduct is commercially reasonable. *See Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.,* 661 F.Supp. 1448, 1476 (D.Wyo.1987). "All the factors are to be evaluated according to the standard of commercial reasonableness under the particular circumstances of the case." *S&S, Inc. v. Meyer,* 478 N.W.2d 857, 863 (Iowa App.1991). Departures from customary usages and commercial practice, flushed out through expert testimony, strongly indicate that the merchant's conduct is unreasonable. Mantese, *The UCC and Keeping the (Good) Faith,* 70 Mich. Bar J. 270, 274 (March 1991) (a party is not required to prove the existence of a specific commercial standard or rule to prove a failure of reasonable commercial standards of fair dealing in the trade where the merchant's conduct is inconsistent with other related norms).

For instance, in *Nanakuli Paving & Rock Co. v. Shell Oil Co.,* 664 F.2d 772 (9th Cir.1981), the Ninth Circuit held that a jury could reasonably have concluded that the supplier's manner of carrying out the price increase did not conform with commercially reasonable standards. In another case, a district court found that, to be commercially reasonable, an oil company's pricing "must maintain a[DTT] price which will permit the [ ] dealers to remain competitive with other dealers and earn a prof-

---

**25.** The commentary to UCC § 1–201 provides that "... in the Article on sales, Section 2–103, good faith is expressly defined as including in the case of a merchant observance of reasonable commercial standards of fair dealing in the trade, so that throughout that Arti-

cle **wherever a merchant appears in the case an inquiry into his observance of such standards is necessary to determine his good faith.**" UCC Section 1–201, cmt. 19 (emphasis added).

it margin that will enable them to remain in business." *See Melso,* 532 F.Supp. at 1286.

The commercially reasonable factor must be regarded as conceded by Exxon. For instance, Exxon claims that it adjusted its wholesale prices in favor of its dealers during the entire twelve-year existence of the DFC program. Its commitment was not illusory. Exxon acknowledges it fully understood the representations made to the dealers and manner in which it would accomplish the underlying commitments on a nationwide basis: "Following the on-set of the Discount for Cash Program in August of 1982, Exxon utilized a pricing methodology that provided a wholesale price reduction to its dealers in an amount which, on average, offset the charge for credit to its dealers." [26] According to Exxon, its actions were consistent with DFC programs implemented by its competitors, both before and after the initiation of its own DFC program. For summary judgment purposes, the Court concludes that it was, therefore, also consistent with fair dealing in the trade based on custom or usage.

In sum, the court respectfully rejects Exxon's argument that, notwithstanding Exxon's conduct in doing as it said it would do, its commitment leads to a number of commercially unreasonable consequences, and therefore, it should be viewed as having made no commitment with any legal effect. Exxon's own expert testified that he thought "it was possible for Exxon to remove an amount from the DTT that on average would be sufficient to offset the credit card cost." From the evidence considered on summary judgment, the Court does not regard Exxon's commitment as being so vague as to be unenforceable on the basis of indefiniteness or impracticality.

Moreover, Plaintiffs specifically claim that Exxon exercised bad faith based on Exxon's plan to double charge for the purpose of running the "non-keeper" dealers out of business. Courts have considered whether a contracting party implemented a policy as an underhanded attempt to drive an individual dealer out of business to determine if that party acted in bad faith contrary to well-established tenets of contract law. *See, e.g., East Bay Running Store, Inc. v. NIKE, Inc.,* 890 F.2d 996, 1000 (7th Cir.1989).

## 2. *Propriety of Summary Judgment on the Issue of Good Faith*

Exxon urges the Court to accept its assertion that it acted in good faith in setting its wholesale price, since its prices were not unreasonable and were comparable to, and at times below, prices charged by other major oil companies in the pertinent areas and were wholly within the terms of the Sales Agreements. However, the parties' intentions in setting an open price term, as well as the reasonableness of an open price term are questions for the trier of fact. *See TCP Industries, Inc.,* 661 F.2d at 548. The question of price then—whether it was reasonable as calculated—is a question for the jury to resolve upon the evidence.

Additionally, in light of the alleged agreement between the parties, which is ascertained in conjunction with oral statements and representations and the literature disseminated by Exxon to implement and explain its DFC program, which it encouraged dealers to implement by promising to reduce its wholesale price of gas in the amount it had been formerly charged to cover the cost of credit card processing and charging such fee only as to credit card receipts actually submitted, there is a question of fact as to whether Exxon breached the contract. Although Exxon was given discretionary authority to set its wholesale price, it was required to set the price in good faith. Good faith means honesty in fact and in conformity with reasonably commercial standards. A jury could find that Exxon breached its duty to act in good faith, thereby breaching its legal obligations under the contract, by charging dealers twice for the cost of cred-

**26.** Plaintiffs claim that Exxon did not perform other than in 1982 and 1991.

it card processing and by concealing this conduct from the dealers, who lowered prices in reliance on Exxon's promises.[27]

In sum, ample record evidence creates issues of fact for the jury as to what Exxon did or did not do during the twelve years of its DFC program, and whether it performed its obligations under the Sales Agreements throughout that period in good faith. The evidence reflects that Exxon had superior knowledge of the market price of gasoline and the cost of credit card processing. Therefore, according to Plaintiffs, they relied upon Exxon's representations that they were purchasing their requirements from Exxon at a price arrived at in good faith. Determining what constitutes good faith necessarily involves factual findings. It is the responsibility of the trier of fact to evaluate the credibility of Plaintiffs' claim of "honesty in fact." *See, e.g., Tonka Tours, Inc. v. Chadima,* 372 N.W.2d 723, 728 (Minn.1985). Moreover, the record exposes issues of fact from which a jury may reasonably find that Exxon's pricing scheme during the DFC program was not commercially reasonable and lacked good faith.

## III. Conclusion

The basic tenet of contract law instructs that "a contract consists of a binding promise or set of promises, [therefore,] a breach of contract is a failure, without legal excuse, to perform any promise which forms the whole or part of a contract." *Montgomery v. Amoco Oil Co.,* 804 F.2d 1000, 1003 n. 6 (7th Cir.1986) (quoting *Williston on Contracts* ). Whether Exxon performed under the Agreement is disputed.

While it is true that there are some matters over which there is no disagreement, it is equally true that other matters are very much disputed. Exxon, for example, denies that it exercised bad faith in adjusting its wholesale price to dealers in a manner that double charged them for the

cost of credit card processing. In fact, Exxon declares that, since it was not legally obligated to adjust its prices in conformity with its dealers' choices, there was no contract under which a covenant of good faith could be breached.

Whether Exxon breached its duty of good faith to its dealers is a question of fact for the jury. *See Tonka Tours, Inc.,* 372 N.W.2d at 728. Although there is evidence to support Exxon's position, there is more than a scintilla of evidence that infers Exxon did not act in a manner consistent with the UCC's requirement of honesty in fact when it refused to offset the wholesale price of its fuel by an amount comparable to its 3% credit card recovery charge. There are also disputed issues regarding what Exxon said to its dealers, or what the dealers came to know, over the course of the DFC program that led them to expect the wholesale price reduction. Thus, there are definite evidentiary conflicts that cannot be summarily adjudicated. Since the Court finds that significant and genuine issues of material fact exist in the record to preclude summary judgment, it is accordingly

**ORDERED AND ADJUDGED** that Exxon's Renewed Motion for Summary Judgment on Count I [D.E. # 1027] is *DENIED.*

*ORDERED.*

---

27. As to damages, it is equally reasonable to conclude that by lowering its cash price, while receiving no decrease in the wholesale price, the dealers were duped into losing profits, and consequently, suffered damages.